2016 OK CIV APP 81

Charles **DEAL** and Annette Deal, Personal Representatives of the Estate of Serenity Deal, Plaintiffs/Appellants,

v.

Sean Devon **BROOKS**, Randy J. Lack, and Jennifer Shawn, Defendants,

and

State of Oklahoma ex rel. Oklahoma Department of Human Services, Defendant/appellee.

Case Number: 113979

THIS OPINION HAS BEEN RELEASED FOR PUBLICATION BY ORDER OF THE SUPREME COURT OF OKLAHOMA

Court of Civil Appeals of Oklahoma, Division No. 2.

Decided: 06/24/2016

Rehearing Denied 08/04/2016

Mandate Issued: 12/30/2016

Joe Vorndran, George Wright, STUART & CLOVER, PLLC, Shawnee, Oklahoma, for Plaintiffs/Appellants

Richard W. Freeman, Jr., Emily B. Fagan, ASSISTANT GENERAL COUNSEL, DEPARTMENT OF HUMAN SERVICES, Oklahoma City, Oklahoma, for Defendant/Appellee

DEBORAH B. BARNES, JUDGE:

¶ 1 This action arises from tragic circumstances involving the murder of a child placed in the custody of her biological father. Plaintiffs/Appellants Charles and Annette Deal (Plaintiffs) appeal the trial court's Order granting summary judgment in favor of Defendant/Appellee State of Oklahoma ex rel. Oklahoma Department of Human Services (DHS). Although the Order does not address all issues and Defendants, the Order states that "there is no just reason for delay," and it expressly directs that the Order "be filed as a final order and judgment as to the Plaintiffs' claims against [DHS] pursuant to 12 O.S. 2011 994."[1]

1. During the pendency of this accelerated appeal, and pursuant to an order of this Court,

¶ 2 The first issue presented on appeal is whether DHS is exempt from tort liability under the Oklahoma Governmental Tort Claims Act, 51 O.S. Supp. 2013 151–172 (GTCA). In particular, 155 of the GTCA provides, in pertinent part, that "[t]he state or a political subdivision shall not be liable if a loss or claim results from: ...; 29. Any claim based upon an act or omission of an employee in the placement of children[.]" Because the claims asserted against DHS are based on acts or omissions of DHS employees in the placement of a child with her biological father, the plain and ordinary meaning of 155(29) requires that we find that a cause of action is unavailable under the GTCA.

¶ 3 The second issue presented on appeal is whether the facts—when viewed on summary judgment in a light most favorable to Plaintiffs—require that this case be remanded for further proceedings on a *"Bosh* claim" against DHS. As this Court recently explained in *GJA v. Oklahoma Department of Human Services*, 2015 OK CIV APP 32, 347 P.3d 310, the Oklahoma Supreme Court, in *Bosh v. Cherokee County Building Authority*, 2013 OK 9, 305 P.3d 994, held "that section 30, article 2 of the Oklahoma Constitution provides a private cause of action for excessive force against an arrested and detained person, *notwithstanding the immunities under the GTCA*[.]" *GJA*, ¶23 (emphasis added). In *GJA*, we confronted the issue of whether the *Bosh* case recognizes a broader scope of actionable claims based upon violations of constitutional rights. *GJA*, ¶26. We concluded in *GJA* that the facts alleged did not state a constitutionally-based claim against DHS under *Bosh*; among other things, the custody arrangement that led to the harm to the children in *GJA* was the result of a custody order in a divorce decree rather than the result of actions undertaken while the children were in the custody of DHS. However, we did not exclude the possibility that a claim may exist against DHS under circumstances where the constitutional rights of a child have been violated by state employees. Indeed, the Oklahoma Supreme Court stated in *Bosh* that the GTCA

cannot be construed as immunizing the state completely from all liability for violations of the constitutional rights of its citizens. To do so would not only fail to conform to established precedent which refused to construe the [GTCA] as providing blanket immunity, but would also render the Constitutional protections afforded the citizens of this State as ineffective, and a nullity.

*Bosh,* ¶23.

¶ 4 In the present case, we conclude that genuine disputes of material fact exist as to whether the child's "substantive due process interest in safe conditions, personal security, and bodily integrity for persons in state custody," *Yvonne L. ex rel. Lewis v. N.M. Dep't of Human Servs.*, 959 F.2d 883, 891 (10th Cir. 1992)—an interest protected by the minimum requirements of the Oklahoma Constitution and the Constitution of the United States—was violated by DHS employees acting recklessly in conscious disregard of a known or obvious risk of serious, immediate, and proximate harm to the child, *Currier v. Doran*, 242 F.3d 905, 918 (10th Cir. 2001). The constitutional right at issue—described in *GJA* as a child's "clearly established constitutional right to be reasonably safe from harm when placed in the state's custody," *GJA*, ¶37 (footnote omitted)—is, as explained in greater detail below, guaranteed by the substantive component of the due process clause. As in *Bosh*, where the GTCA did not immunize the state from liability for excessive force inflicted *on a prisoner* while in its custody, we conclude the GTCA does not immunize DHS from liability for reckless and deliberate acts that deprive *a child* of her due process rights while in state custody.

¶ 5 Therefore, we affirm that portion of the trial court's Order finding that a cause of action under the GTCA is unavailable. However, because genuine disputes of material fact remain regarding a violation of the child's constitutional rights under the due process clause—in particular, whether certain DHS employees, acting within the scope

appellate briefing was filed by the parties and oral argument was subsequently held on May 26, 2016.

of their employment, acted recklessly in conscious disregard of a known or obvious risk of serious, immediate, and proximate harm to the child, and whether their conduct, when viewed in total, is conscience shocking—we reverse the trial court's award of summary judgment, and we remand for further proceedings against DHS.

## BACKGROUND

¶ 6 In November 2013, Plaintiffs filed their second amended petition asserting they are the maternal grandparents of a minor child who, on or about June 4, 2011, "was beaten to death by [Defendant Sean Devon Brooks]," her biological father. Indeed, Brooks is now serving a life sentence for murder in the first degree at the Joseph Harp Correctional Center in Lexington, Oklahoma. Plaintiffs assert the child, who was born in May 2006, did "not meet [Brooks] until she was four years old," and that, until that time, the child lived with her mother and Plaintiffs. They assert that in June 2009, "DHS received a referral relating to [the child's mother]," and that, in September 2010, "the [district court] placed [the child] in [the] emergency custody of [DHS]." Plaintiffs assert they filed a petition to adopt the child and, "[p]ursuant to Oklahoma Statute, Brooks was given notice of the proceedings, and a paternity test confirmed that he was the biological father of the child." They assert Brooks refused to consent to the adoption by Plaintiffs, and, subsequently, the district court ruled Plaintiffs could not adopt the child over the objection of Brooks. Plaintiffs acknowledge they appealed this ruling and "the Supreme Court affirmed . . . ."

¶ 7 Plaintiffs assert that in April 2010, Brooks filed a petition seeking sole custody of the child. They further assert that after the child was placed in the emergency custody of DHS, DHS failed to make proper recommendations, and also withheld vital information, relating to the child's placement. They assert that "[i]n the two months prior

to DHS's placement of [the child] with Brooks, DHS workers"—i.e., certain DHS workers not named as defendants in this case—"expressed serious concerns about the placement." They assert, however, that these serious concerns, in addition to information evidencing abuse of the child by Brooks during unsupervised visitation, "was not released" to the district court or the district attorney prior to the placement determination.

¶ 8 Plaintiffs further assert that Defendants Jennifer Shawn (Shawn) and Randy J. Lack (Lack) are former DHS workers who both ultimately "pled guilty . . . to a charge of suppressing evidence in violation of 21 O.S. 546" in connection with the placement determination. Plaintiffs further assert that both of these Defendants were then terminated by DHS.[2]

¶ 9 As against DHS, Plaintiffs assert tort theories of negligence, negligence per se, intentional infliction of emotional distress, and wrongful death. Plaintiffs also assert they complied with the notice requirements of the GTCA.

¶ 10 In the Answer of DHS, DHS asserts, among other things, that Plaintiffs' action against it "is barred by the [GTCA]," and, in particular, it asserts it is shielded from liability "pursuant to the applicable exemptions" set forth in 155 of the GTCA. DHS also asserts that the child's death was "the result of intervening and supervening criminal acts of third persons" for which DHS should not be held responsible.

¶ 11 Plaintiffs filed a motion for partial summary judgment in February 2015, seeking summary judgment against what it refers to as "the DHS Defendants"—i.e., Shawn, Lack, and DHS. In its response, DHS requests that Plaintiffs' motion be denied, and they request that summary judgment instead be granted in favor of DHS. DHS argues, among other things, that even if its employees were acting within the scope of their employment and were negligent, DHS is nev-

---

2. Plaintiffs also assert that "DHS worker Donald Wheeler"—who they assert was one of the employees who had expressed serious concerns about the placement of the child with Brooks—committed suicide after the child's death, appar-

ently for reasons related to DHS's mishandling of its tasks and duties related to the child's placement with Brooks, and/or for reasons related to the initial misdirection of the blame on Wheeler.

ertheless exempt from tort liability as a matter of law under the exemptions set forth in 155 of the GTCA, including

> 51 O.S. 155(3) (losses resulting from execution or enforcement of a court order); 51 O.S. 155(4) (losses resulting from enforcement of or failure to enforce a statute or written policy); and 51 O.S. 155(29) (losses resulting from acts or omissions of an employee in the placement of children).

¶ 12 Pertinent to this appeal, the trial court, in its Order filed in May 2015, denied Plaintiffs' motion as to DHS and, instead, granted summary judgment in favor of DHS. As stated above, the trial court then ordered that, "as to the Plaintiffs' claims against [DHS]," there is no just reason for delay and it expressly directed that the Order be filed as a final and appealable order.

¶ 13 From this portion of the Order awarding summary judgment in favor of DHS, Plaintiffs appeal.

## STANDARD OF REVIEW

■ ¶ 14 The standard of review applicable to this case is as follows:

> Summary relief issues stand before us for *de novo* review. All facts and inferences must be viewed in the light most favorable to the non-movant. Appellate tribunals bear the same affirmative duty as is borne by [trial] courts to test for legal sufficiency all evidentiary material received in summary process in support of the relief sought by the movant. Only if the court should conclude there is no material fact (or inference) in dispute and the law favors the movant's claim or liability-defeating defense is the moving party entitled to summary relief in its favor.

*Reeds v. Walker*, 2006 OK 43, ¶9, 157 P.3d 100 (footnotes omitted).

**3.** "The primary goal in reviewing a statute is to ascertain legislative intent, if possible, from a reading of the statutory language in its plain and ordinary meaning." *W.R. Allison Enters., Inc. v. CompSource Okla.*, 2013 OK 24, ¶15, 301 P.3d 407 (citation omitted). "When the language of the statute is plain, it will be followed without further inquiry." *Okla. City Zoological Trust v.*

## ANALYSIS

### I. The Availability of a Cause of Action Under the GTCA

■ ¶ 15 The parties do not dispute that DHS constitutes a political subdivision under the GTCA, and, as a consequence, DHS can ordinarily be held liable in tort only to the extent set forth in the GTCA. Generally, "[t]he GTCA is the exclusive remedy for an injured plaintiff to recover against a governmental entity in tort. Subject only to the GTCA's specific limitations and exceptions, governmental immunity is waived under the GTCA." *Tuffy's, Inc. v. City of Okla. City*, 2009 OK 4, ¶7, 212 P.3d 1158 (footnotes omitted). *See also Speight v. Presley*, 2008 OK 99, ¶11, 203 P.3d 173 (The GTCA "is the exclusive remedy by which an injured plaintiff may recover against a governmental entity for its negligence," and "[i]f an employee is acting outside the scope of employment, the GTCA does not apply.") (citations omitted).

■ ¶ 16 We conclude that the following exemption, pertaining to "the placement of children," clearly operates to exempt DHS from tort liability in this case under the GTCA. Title 51 O.S. Supp. 2013 155(29) provides as follows:

> The state or a political subdivision shall not be liable if a loss or claim results from:
>
> . . .;
>
> 29. Any claim based upon an act or omission of an employee in the placement of children[.][3]

¶ 17 Indeed, this Court recently acknowledged in *GJA*, 2015 OK CIV APP 32, 347 P.3d 310, that 155(29) pertains to acts or omissions of DHS employees in the placement of children. *GJA*, ¶20. In *GJA*, the plaintiff/father alleged in his petition that his children were abused while in their mother's (i.e., his former spouse's) custody. He alleged that DHS was informed about the abuse but

*State ex rel. Pub. Employees Relations Bd.*, 2007 OK 21, ¶6, 158 P.3d 461. "If a statute is plain and unambiguous, it will not be subjected to judicial construction but will receive the interpretation and effect its language dictates." *Rogers v. QuikTrip Corp.*, 2010 OK 3, ¶11, 230 P.3d 853 (footnote omitted).

did nothing. DHS filed a motion to dismiss which the trial court granted.

¶ 18 As to the applicability of 155(29), we stated in *GJA* that because "both children were living with their mother at the time and in accordance with the Decree of Divorce," because "the children were not 'placed' by DHS employees," and because there was no "claim based upon an act or omission in the placement of the children," that the exemption set forth in 155(29) did not apply. *GJA*, ¶¶20–21.

¶ 19 However, in the present case, all of the tort theories asserted against DHS are based upon acts and omissions of DHS employees in the placement of the child with Brooks. As stated above, Plaintiffs assert in their petition that after the child was placed in the emergency custody of DHS, DHS failed to make proper recommendations, and also withheld vital information, relating to the child's ultimate placement with her biological father. In Plaintiffs' motion for partial summary judgment, they elaborate that "the DHS Defendants committed numerous breaches of duty" as a result of a failure to provide the district court with the proper documentation relating to the child's placement; as a result of a failure to properly scrutinize the appropriateness of the child being placed with Brooks; and as a result of a "failure to check Brooks' criminal record" prior to the placement decision. Clearly, these constitute acts or omissions of one or more DHS employees in the placement of a child. 155(29).

¶ 20 Somewhat more ambiguously, the breaches, as elaborated by Plaintiffs in their motion for partial summary judgment, also include a "failure to investigate why Brooks did not seek medical care for [the child] when the severity of her bruising became apparent," a "failure to inquire why Brooks did not call the foster parent or case worker when he 'dropped' [the child]," and a "failure to appreciate the inconsistency in Brooks' explanations for [the child's] bruises and other injuries." However, as to these alleged failures, the evidentiary materials attached to Plaintiffs' motion reveal that they also occurred prior to the decision to place the child with Brooks, and Plaintiffs have set them forth as reasons why the decision to place the child with Brooks was, at least, a negligent one. No assertion has been made that DHS was negligent *after* the placement decision was made, nor is any support for such an assertion contained in the evidentiary materials.

¶ 21 In this regard, a brief overview of the timeline of events is instructive. As stated above, Plaintiffs assert that in June 2009, "DHS received a referral relating to [the child's mother]," and, in September 2010, the child was placed in the emergency custody of DHS. The evidentiary materials reveal that, by January 2011, the child had not yet been placed with Brooks, but had, instead, been placed in a foster home. The evidentiary materials reveal that pre-placement visits between the child and Brooks began soon after the child was taken into DHS custody, and visitation with Brooks "progressed from supervised visits to unsupervised day visits to overnights and into extended overnights." However, by early 2011, the placement decision had not yet been made and the child remained in foster care.

¶ 22 In late March 2011, serious concerns about the potential placement of the child with Brooks were expressed by non-defendant DHS employees, as stated above. In fact, "[f]or the period of time from March 15, 2011, through May 9, 2011, there were multiple emails expressing concerns of the foster parents...." However, the evidentiary materials reveal that the decision to place the child with Brooks was not made until May 11, 2011. A certain DHS report then "informed the court," at a hearing held on May 25, 2011, "that the child ... was placed with [Brooks] on May 11, 2011, and that the recommendation from [DHS] was that the child ... remain in the home of [Brooks]."[4]

¶ 23 The timeline of events thus reveals that after the decision to place the child with

---

4. This report set forth the above-mentioned January 2011 referrals, but described them as mere accidents resulting from "running in the house," and "falling out of her father's arms...." According to the evidentiary materials, one of the Defendant DHS workers completed the report, and it was signed by the other Defendant DHS worker.

Brooks was made, and after the May 25, 2011 hearing, the child's death occurred just ten days later, prior to, for example, any scheduled review of the placement or other opportunity to intervene. No assertion has been made by Plaintiffs that DHS was negligent *after* the placement decision was made in May 2011; instead, all of the claims asserted against DHS are based upon the acts and omissions of the DHS Defendants in the placement of the child with Brooks.

¶ 24 In conclusion, the Legislature, under 155(29), has exempted DHS from tort liability under the GTCA for "[a]ny claim based upon an act or omission of an employee in the placement of children[.]" Because the tort claims asserted against DHS are based solely on acts or omissions of DHS employees in the placement of the child with Brooks, the plain and ordinary meaning of 155(29) requires that we find a cause of action under the GTCA to be unavailable.

## II. Bosh Claim

 ¶ 25 In *Perry v. City of Norman*, 2014 OK 119, 341 P.3d 689, the Oklahoma Supreme Court explained that a *"Bosh* claim" is limited to those circumstances where a cause of action under the GTCA is unavailable. Having concluded that a cause of action is unavailable under the GTCA in this case, we turn to the issue of whether a *Bosh* claim—based on a violation of the child's constitutional rights—may be available.[5]

 ¶ 26 We first note that although the parties and the trial court do not appear to have entertained the possibility of a *Bosh* claim in the proceedings below, "[w]hen rendering summary judgment ... [the court is] not only authorized *but required to rule out all theories of liability* fairly comprised within the evidentiary materials before [it]." *Hadnot v. Shaw*, 1992 OK 21, ¶25, 826 P.2d 978 (emphasis in original). *See also Parris v. Limes*, 2012 OK 18, ¶3, 277 P.3d 1259 ("It is well-settled that in determining the propriety of granting a summary judgment, the trial court *is not only authorized but required* to rule out all theories of liability fairly encompassed within the evidentiary material presented.") (emphasis added) (citation omitted). Furthermore, this Court is required under 12 O.S. 2011 2201(A) to take judicial notice of fundamental rights.[6] *See, e.g., State ex rel. Okla. Bar Ass'n v. Lobaugh*, 1988 OK 144, 12

5. We note that in April 2014, after the issuance of *Bosh*, the Legislature amended 153(B) of the GTCA. Prior to 2014, and following the Oklahoma Supreme Court's Opinion in *Bosh*, 51 O.S. 2011 153(B) provided: "The liability of the state or political subdivision under this act shall be exclusive and in place of all other liability of the state, a political subdivision or employee at common law or otherwise." In April 2014, 153(B) was amended to state the following:

The liability of the state or political subdivision under [the GTCA] shall be exclusive and shall constitute the extent of tort liability of the state, a political subdivision or employee arising from common law, statute, the Oklahoma Constitution, or otherwise. If a court of competent jurisdiction finds tort liability on the part of the state or a political subdivision of the state based on a provision of the Oklahoma Constitution or state law other than [the GTCA], the limits of liability provided for in [the GTCA] shall apply.

51 O.S. Supp. 2014 153(B). *See also* Supp. 2015 153(C). Thus, the April 2014 amendment may constitute an attempt by the Legislature to diminish or destroy constitutionally-based causes of action against the state or political subdivision. However, we need not, and do not, address this amendment because it is not applicable to the present case. The 2014 amendment went into effect after Plaintiffs filed this case (and, indeed,

several months after Plaintiffs filed their second amended petition in November 2013). "Statutes are typically not given retroactive effect unless the Legislature has made its intent to do so clear. Any doubts must be resolved against a retroactive effect." *CNA Ins. Co. v. Ellis*, 2006 OK 81, ¶13, 148 P.3d 874 (citation omitted). The Legislature did not set forth any intent to give the April 2014 amendment a retroactive effect. Furthermore,

[r]emedial or procedural statutes may operate retrospectively only where they do not create, enlarge, diminish or destroy vested rights. A substantive change that alters the rights or obligations of a party cannot be viewed as solely a remedial or procedural change and cannot be retrospectively applied. Substantive legislation must be given purely prospective application.

*Burch v. State ex rel. Okla. Dep't of Human Servs.*, 2007 OK CIV APP 71, ¶7, 166 P.3d 502 (internal quotation marks omitted) (citations omitted). The 2014 amendment is substantive rather than procedural in nature and, thus, cannot be applied retroactively to this case.

6. Section 2201(A) provides: "Judicial notice shall be taken by the court of the common law, constitutions and public statutes in force in every state, territory and jurisdiction of the United States."

n.7, 781 P.2d 806. *See also Pettit v. Am. Nat'l Bank of Austin*, 1982 OK 85, ¶9, 649 P.2d 525 ("As a general rule, issues not presented to the trial court will not be considered on appeal. Lack of due process claims are an exception to that rule.").

¶ 27 As this Court recently explained in *GJA*, the Oklahoma Supreme Court, in *Bosh*, held "that section 30, article 2 of the Oklahoma Constitution provides a private cause of action for excessive force against an arrested and detained person, *notwithstanding the immunities under the GTCA*[.]" *GJA*, 2015 OK CIV APP 32, ¶23, 347 P.3d 310 (emphasis added). In *GJA*, we confronted the following question: "Should the *Bosh* case be limited to its facts and specific holdings or does the decision stand for the proposition that the Supreme Court recognizes a broader scope of actionable claims based upon violations of constitutional rights?" *GJA*, ¶26. We concluded in *GJA* that the facts alleged failed to state a valid *Bosh* claim. However, we did not exclude the possibility that such a claim against DHS may exist under circumstances where the constitutional rights of a child have been violated. Indeed, as quoted above, the *Bosh* Court stated that the GTCA

> cannot be construed as immunizing the state completely from all liability for violations of the constitutional rights of its citizens. To do so would not only fail to conform to established precedent which refused to construe the [GTCA] as providing blanket immunity, but would also render the Constitutional protections afforded the citizens of this State as ineffective, and a nullity.

*Bosh*, 2013 OK 9, ¶23, 305 P.3d 994.

¶ 28 In the present case, at issue is the child's "substantive due process interest in safe conditions, personal security, and bodily integrity for persons in state custody," *see Yvonne*, 959 F.2d at 891, and whether that interest was violated by DHS employees acting within the scope of their employment. The constitutional right at issue—described in *GJA* as a child's "clearly established constitutional right to be reasonably safe from harm when placed in the state's custody," *GJA*, ¶37 (footnote omitted)—is guaranteed under the minimum protections afforded by the due process clause of the Oklahoma Constitution, which provides that "[n]o person shall be deprived of life, liberty, or property, without due process of law," Okla. Const. art. 2, 7, and by the Fourteenth Amendment of the United States Constitution—which provides, in pertinent part, as follows: "[N]or shall any State deprive any person of life, liberty, or property, without due process of law," U.S. Const. amend. XIV, 1.[7]

¶ 29 As in *Bosh*, where the Oklahoma Supreme Court declined to construe the GTCA so as to immunize the state from constitutionally-based liability for excessive force inflicted *on a prisoner* while in its custody, we conclude the GTCA does not immunize DHS from liability for certain reckless and deliberate acts that deprive *a child* of due process rights while in state custody. To decide otherwise would render as ineffective, and a nullity, a child's fundamental "interest in safe conditions, personal security, and bodily integrity for persons in state custody" guaranteed under the due process clause of both the United States Constitution and the Oklahoma Constitution. *Yvonne*, 959 F.2d at 891.

## A. More Than a Mere Lack of Due Care

¶ 30 We emphasize that the due process clause does *not* protect a child from mere lack of due care on the part of government employees, nor does it serve to supplant the GTCA or traditional tort law generally. "[T]he Due Process Clause, like its forebear in the Magna Carta, was intended to secure the individual from the arbitrary exercise of the powers of government[.]" *Daniels v. Williams*, 474 U.S. 327, 331, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) (citations omitted) (internal quotation marks omitted).

7. Of course, "[t]he Oklahoma Constitution does not merely project a mirror image of the federal constitution." *Bosh*, ¶29 n.42. However, the minimum level of protection afforded under the due process clause is determined by federal law: "The state of Oklahoma in the exercise of its sovereign power may provide more expansive individual liberties than those conferred by the United States Constitution—it is only when state law provides less protection that the question must be determined by federal law." *Id.*

The substantive component of the due process clause, "by barring certain government actions regardless of the fairness of the procedures used to implement them ... serves to prevent governmental power from being used for purposes of oppression[.]" *Id.* (citations omitted) (internal quotation marks omitted).

¶ 31 As the United States Supreme Court indicated in *Daniels*, to equate a deprivation of life or liberty under the due process clause with mere negligence—such as the negligence present in *Daniels* where an employee of a prison accidentally left a pillow in a stairwell which caused a prisoner to trip and fall—"would trivialize the centuries-old principle of due process of law." *Id.* at 332, 106 S.Ct. 662.

> The Fourteenth Amendment is a part of a Constitution generally designed to [inter alia] ... secure certain individual rights against both State and Federal Government. ... [W]e bear in mind Chief Justice Marshall's admonition that "we must never forget, that it is · a constitution we are expounding[.]" Our Constitution deals with the large concerns of the governors and the governed, but it does not purport to supplant traditional tort law in laying down rules of conduct to regulate liability for injuries that attend living together in society. We have previously rejected reasoning that "'would make of the Fourteenth Amendment a font of tort law to be superimposed upon whatever systems may already be administered by the States[.]'"

*Id.* (citations omitted). *See also Town of Castle Rock, Colo. v. Gonzales*, 545 U.S. 748, 768, 125 S.Ct. 2796, 162 L.Ed.2d 658 (2005) (Noting the "continuing reluctance" on the part of the United States Supreme Court "to treat the Fourteenth Amendment as 'a font of tort law[.]' ").

¶ 32 Thus, as explained by the United States Court of Appeals for the Tenth Circuit,

> harm associated with a negligent act is never constitutionally cognizable under the Due Process Clause. *Daniels v. Williams*, 474 U.S. 327, 328, 106 S.Ct. 662, 88 L.Ed.2d 662] (1986).

Rather, due process guarantees historically have applied only to "*deliberate* decisions." *Id.* at 331, 106 S.Ct. 662. ... Those guarantees are "not implicated by a *negligent* act of an official causing unintended loss of injury to life, liberty, or property." *Id.* at 328, 106 S.Ct. 662 ...; *see also Parratt v. Taylor*, 451 U.S. 527, 548, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981) (Powell, J., concurring), *overruled by Daniels*, 474 U.S. at 328, 106 S.Ct. 662 ... (foretelling *Daniels* by opining that a negligent act causing "unintended loss" never "works a deprivation in the *constitutional sense*"). In other words, *regardless of the circumstances preceding the act*, a negligent act that is directly responsible for causing harm to the victim never constitutes a substantive due process violation because such an act never constitutes a constitutional deprivation of life, liberty, or property.

*Gray v. Univ. of Colo. Hosp. Auth.*, 672 F.3d 909, 928–29 (10th Cir. 2012).

¶ 33 Consequently, to the extent that DHS employees were merely negligent, no constitutionally-based claim against DHS is available. However, as discussed below, because this case involves the murder of a four-year-old child and potentially egregious and deliberate acts on the part of government employees in recklessly and knowingly placing that child in harm's way, genuine disputes of material fact exist as to whether a constitutionally cognizable harm exists.

## B. Respondeat Superior

¶ 34 Given the potentially egregious nature of the actions undertaken by the DHS employees while the child was in state custody, the issue arises as to whether these DHS employees could possibly have been acting within the scope of their employment. For the reasons set forth below, however, we conclude that, at the very least, genuine disputes of fact exist as to whether the DHS employees were acting within the scope of their employment.

¶ 35 In *Bosh*, prison employees severely beat and injured a prisoner while that prisoner was in custody and being booked, and they denied that prisoner medical attention for

two days. Nevertheless, the Oklahoma Supreme Court stated that "[a]ssaults of excessive force can certainly occur within one's scope of employment." 2013 OK 9, ¶29, 305 P.3d 994 (footnote omitted). In the context of actions by police officers, for example, the *Bosh* Court explained that

> governmental employees such as police officers, whether on duty or off duty, have been held to the possibility that conduct such as striking arrestees, physically and verbally attacking customers of a private business, causing a car accident, or injuring detainees/arrestees, may have occurred within the scope of employment subjecting their employers to liability.

*Id.* ¶16 (footnotes omitted). Thus, the Court explained that the issue "hinge[s] on whether one acted within the scope of employment *by engaging in work assigned, or if doing what was proper, necessary and usual to accomplish the work assigned,* or doing that which was customary within the particular trade or business." *Id.* (emphasis added) (footnote omitted).

¶ 36 Of course, the present case involves neither prison guards nor police officers. However, because the scope of employment issue hinges on whether the DHS employees'

actions were "incident to the attempt to perform the master's business," and whether the actions were "incident to some service being performed for the employer," *id.* ¶12 (citation omitted), at the very least a genuine dispute of fact exists in this regard.[8] Citing to *Bosh*, the Oklahoma Supreme Court recently stated: "Under this doctrine [i.e., the doctrine of respondeat superior] an employer is generally held liable for the willful acts of an employee acting within the scope of employment." *Gowens v. Barstow*, 2015 OK 85, ¶12, 364 P.3d 644. Thus, even willful acts of employees causing serious harm may occur within the scope of employment if incident to the employer's services or to an attempt to perform those services.[9]

### C. Constitutional Basis of a *Bosh* Claim in the Present Case

▮ ¶ 37 In *GJA* we cited to *Yvonne*, in support of the existence of a child's "clearly established constitutional right to be reasonably safe from harm when placed in the state's custody." *See GJA*, ¶37 & n.15. In *Yvonne*, the court explained that the United States Supreme Court "has found a substantive due process interest in safe conditions, personal security, and bodily integrity for

---

8. The *Bosh* Court noted that

> even a wilful assault can be within the scope of employment if: 1) the act is fairly and naturally incident to the employer's business; 2) the act occurs while the employee is engaged in an act for the employer; or 3) the assault arises from a natural impulse growing out of or incident to the attempt to complete the master's business.

*Id.* ¶29 n.39 (citation omitted).

9. Further discussion supporting this conclusion is also found in *Bosh*, where the Supreme Court discussed the following case:

> In *Baker v. Saint Francis Hospital*, 2005 OK 36, ¶18, 126 P.3d 602, a jury question was presented whether a daycare caregiver was acting within the scope of employment so as to hold her employer liable for intentionally striking a child's head on corner of shelf. The Court noted at ¶12 that:
> Oklahoma case law provides examples of cases involving torts for which the employer was held liable and those in which the employer was not held liable. Early in statehood the Court held that a railroad company was liable for the actions of the train auditor, who falsely imprisoned a passenger arising out of a controversy over the payment of a fare. The Court stated the general rule

that a corporation, like an individual, is liable for any tort committed by its agent in the course of his employment, *"even though the act is done wantonly and recklessly, or was against the express orders of the company."* *Chicago R.I. & P. Ry. Co. v. Radford*, 1913 OK 7, ¶4 [36 Okla. 657], 129 P. 834, 837. Other cases holding the employer liable for the tort of the employee include: *Ada–Konawa Bridge Co. v. Cargo*, 1932 OK 790 [163 Okla. 122], 21 P.2d 1 (the servant of the toll bridge company shot an automobile driver when he drove past the toll gate and failed to pay the toll); *Russell–Locke Super–Service v. Vaughn*, 1935 OK 90 [170 Okla. 377], 40 P.2d 1090 (the servant of a corporation selling and servicing automobile batteries injured the plaintiff in a fight after the servant tried to repossess a battery from the plaintiff's vehicle); *Mistletoe Express Service v. Culp*, 1959 OK 250, 353 P.2d 9 (the servant for a common carrier of freight assaulted the plaintiff when he refused to accept a television tube after the common carrier denied the plaintiff's claim for damage in transit); and *Rodebush v. Oklahoma Nursing Homes, Ltd.*, 1993 OK 160, 867 P.2d 1241 (the employee of a nursing home forcefully slapped a combative male Alzheimer's patient while bathing the patient).
> *Bosh*, ¶13 (emphasis added) (footnote omitted).

persons in state custody[.]" 959 F.2d at 891 (citations omitted). The *Yvonne* Court stated, moreover,

> that foster children, like involuntarily committed patients, are "entitled to more considerate treatment and conditions" than criminals. These are young children, taken by the state from their parents for reasons that generally are not the fault of the children themselves. The officials who place the children are acting in place of the parents.

*Id.* at 894 (citation omitted).

¶ 38 However, the court indicated an important distinction may exist between those instances where harm has occurred to a child while in state custody—whether in foster care or some other form of state care or care by an agent of the state—and those cases where the child was harmed "in his *parents'* custody." *Id.* at 891 (citation omitted). That is, the *Yvonne* Court stated as follows:

> The [United States Supreme] Court in *De-Shaney v. Winnebago County Dep't of Social Servs.*, 489 U.S. 189, 201, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), held there is no affirmative duty of the state to protect a child who is in his *parents'* custody. In a footnote, the Court recognized that

> [h]ad the State by the affirmative exercise of its power removed [the child in the *DeShaney* case] from free society and placed him in a foster home operated by its agents, we might have a situation sufficiently analogous to incarceration or institutionalization to give rise to an affirmative duty to protect. Indeed, several Courts of Appeal have held ... that the State may be held liable under the Due Process Clause for failing to protect children in foster homes from mistreatment at the hands of their foster parents.

*Yvonne*, 959 F.2d at 891.

¶ 39 In the present case, the child's death occurred after physical custody of the child had been granted to the child's biological father.[10] Thus, it is undisputed that the child was not harmed, directly, by a state actor; rather, the child was directly harmed (and murdered) by a parent—her biological father—a short time after that parent gained physical custody of her.

¶ 40 In *DeShaney*, a child (through his guardian ad litem) and the child's mother alleged that a state social service agency and its employees deprived the child of liberty without due process of law "by failing to intervene to protect him against a risk of violence at his father's hands of which they knew or should have known." 489 U.S. at 193, 109 S.Ct. 998. However, the *DeShaney* Court "was unmoved and established the general rule that the State's failure to protect an individual 'against private violence simply does not constitute a violation of the Due Process Clause.'" *Gray v. Univ. of Colo. Hosp. Auth.*, 672 F.3d 909, 915 (10th Cir. 2012) (quoting *DeShaney*). The *DeShaney* Court explained that the due process clause "does not transform every tort committed by a state actor into a constitutional violation," 489 U.S. at 202, 109 S.Ct. 998, and even taking as true the fact that "the State ... specifically proclaimed, by word and by deed, its intention to protect [the child] against that danger," a constitutional violation was found to not exist under the circumstances presented, *id.* at 197, 109 S.Ct. 998.

¶ 41 In particular, as explained by the Tenth Circuit, "[a] constitutional duty to protect on the part of the State does not arise 'from the State's knowledge of the individual's predicament or from its expressions of intent to help him.'" *Gray*, 672 F.3d at 915 (quoting *DeShaney*). The *DeShaney* Court stated that

> nothing in the language of the Due Process Clause itself requires the State to protect the life, liberty, and property of its citizens against invasion by private actors. The Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without "due process of law," but its language cannot fairly be extended to impose

---

**10.** We note it appears the child was still in the "legal" custody of DHS. However, we need not, and do not, decide this issue at this time.

an affirmative obligation on the State to ensure that those interests do not come to harm through other means.

489 U.S. at 195, 109 S.Ct. 998.

¶ 42 However, "[a]s an exception to the general rule, the [*DeShaney*] Court stated that 'when the State takes a person into custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being.'" *Gray*, 672 F.3d at 915–16. The *DeShaney* Court stated:

> [I]t is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, or other similar restraint of personal liberty—which is the "deprivation of liberty" triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means.

489 U.S. at 200, 109 S.Ct. 998 (footnote omitted).

¶ 43 As explained by the United States Court of Appeals for the Third Circuit:

> *DeShaney* certainly stands for the harsh proposition that even though state officials know that a person is in imminent danger of harm from a third party, the fourteenth amendment imposes upon those state officials no obligation to prevent that harm. *This holding is limited, however, to situations in which the state is not involved in the harm, either as a custodian or as an actor.*

*Horton v. Flenory*, 889 F.2d 454, 457 (3d Cir. 1989) (emphasis added). Indeed, the *DeShaney* Court emphasized that, "[w]hile the State may have been aware of the dangers that [the child in *DeShaney*] faced in the free world, *it played no part in their creation, nor did it do anything to render him any more vulnerable to them.*" 489 U.S. at 201, 109 S.Ct. 998 (emphasis added). The Court emphasized that although the state took temporary custody of the child, "when it returned him to his father's custody, it placed him in no worse position than that in which

he would have been had it not acted at all[.]" *Id.* at 201, 109 S.Ct. 998.

¶ 44 Thus,

> The Due Process clause of the Fourteenth Amendment protects an individual's life, liberty, and property against government actions. *Daniels v. Williams*, 474 U.S. 327, 331, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). Generally, it does not require the state to protect life, liberty, and property of its citizens against invasion by private actors. [*DeShaney*]. There are, however, *two recognized exceptions to this rule. First*, state officials may be liable for the acts of private parties when the state has assumed a *special relationship* with and control over an individual. *Rost ex rel. K.C. v. Steamboat Springs RE–2 Sch. Dist.*, 511 F.3d 1114, 1126 (10th Cir. 2008). *Second*, state officials can be liable for the acts of private parties where those officials *created the very danger that caused the harm. Christiansen [v. City of Tulsa]*, 332 F.3d [1270,] 1281 [ (10th Cir. 2003) ] (citation omitted).

*Estate of B.I.C. v. Gillen*, 710 F.3d 1168, 1173 (10th Cir. 2013) (emphasis added).

¶ 45 The first exception—the special relationship exception—is inapplicable to the present case because the harm to the child occurred outside the physical control of the state. In the following case, for example, the court stated:

> Even if such circumstances constituted a custodial relationship, that relationship ended once [the child] exited the car and ran to his house because at that point he was no longer under any involuntary restraint by a school official. The only "restraint" imposed upon [the child] after his removal from school was [a school official's] directive that he not return to school that day. Otherwise, [the child] was free to do whatever he wanted, including voluntarily leaving his house. Banning a student from the school grounds does not rise to the same level of involuntary restraint as arresting, incarcerating, or institutionalizing an individual. The fact that Armijo ended his life *after* he was "released" by [a school counselor] bars any liability under the special relationship doctrine.

*Armijo ex rel. Chavez v. Wagon Mound Pub. Schs.*, 159 F.3d 1253, 1261–62 (10th Cir. 1998).

¶ 46 As to the second exception—the state-created danger exception—the Tenth Circuit has explained that *DeShaney*

> by negative implication … "leaves the door open for liability" where the State creates a dangerous situation for citizens in the free world or renders them more vulnerable to danger. We walked through that door [in *Graham v. Independent School District No. I-89*, 22 F.3d 991 (10th Cir. 1994)] only to uphold the dismissal of the complaint because it failed to allege "affirmative actions by the defendants that created or increased the danger to the victims."

*Gray*, 672 F.3d at 916 (footnote omitted). The *Gray* Court explained that "the danger creation theory must ultimately rest on the specifics of a substantive due process claim—i.e. a claim predicated on reckless or intentionally injury-causing state action which 'shocks the conscience.'" *Id.* at 917. Importantly, the due process clause is not triggered unless the state has "place[d] the child 'at substantial risk of serious, *immediate*, and *proximate* harm,'" and "the threat of harm must be of 'limited range and duration,' rather than generally applicable to a broader populace"; that is, "the conduct should be directed at a discrete plaintiff rather than at the public at large[.]" *Gray*, 672 F.3d at 920. The *Gray* Court again emphasized that "the state-created danger theory is an exception to the rule that state actors generally are not liable for acts of private violence." *Id.* at 921.

¶ 47 In *Currier v. Doran*, 242 F.3d 905 (10th Cir. 2001)—a case involving facts similar to those in the present case—the court analyzed the circumstances under the danger creation theory. There the plaintiffs alleged, among other things, "that their Fourteenth Amendment rights were violated when [the state] affirmatively removed them from the custody of their mother and then placed them in the custody of their abusive father." *Id.* at 917. The state responded by asserting the plaintiffs' claims were barred by *DeShaney*, but the *Currier* Court explained that "state officials can be liable for the acts of third parties where those officials 'created the danger' that caused the harm." 242 F.3d at 917 (quoting *Seamons v. Snow*, 84 F.3d 1226, 1236 (10th Cir. 1996)). In response to the defendants' argument that the plaintiffs had failed to allege a constitutional violation of the state creating the danger "because custody was simply transferred from one natural parent to another," the court explained:

> *DeShaney* does not … compel this conclusion. In this case, [the children] were removed from their mother and placed with their father. In *DeShaney*, [the child] was removed from his father and then returned to his father. [Here, the children] would not have been exposed to the dangers from their father but for the affirmative acts of the state; the same cannot be said for [the child] in *DeShaney*.

*Currier*, 242 F.3d at 918 (citation omitted).[11]

¶ 48 The court concluded: "Thus, neither *DeShaney* nor other authorities shield the

11. The court further explained as follows:

The limited caselaw does not support Defendants' theory that they are shielded by *DeShaney* because [the children] were placed in the custody of their natural father. In *Ford v. Johnson*, the United States District Court for the Eastern District of Pennsylvania considered the constitutional claims of the mother of a child who had been beaten to death by his father. *See* 899 F.Supp. 227, 233 (E.D. Pa. 1995). The child had been in state custody before being placed with her father by court order after an investigation and recommendation by local social workers. *See id.* The court decided that the mother had stated a constitutional claim by alleging that the social workers failed to investigate the father and failed to report information to the juvenile court which would have disqualified the father from gaining custody. *See id.* at 232. The court stated that just because "the child is placed with a parent as opposed to a foster parent should not change the standards by which social agencies and their employees conduct their investigations." *Id.* at 233.

Similarly, in *Tazioly v. City of Philadelphia*, the same court held that the "state-created danger theory may apply in cases where a state actor has rendered a minor more vulnerable to injury at the hands of the minor's biological parent." No. CIV.A. 97–CV–1219, 1998 WL 633747, at *11 (E.D. Pa. Sept. 10, 1998) (unpublished disposition). In *Tazioly* the City Department of Human Services removed a child from a foster parent and placed him in the custody of his mother. The court distinguished *DeShaney* by noting that in *DeShaney* there was insufficient evidence of

Defendants. When the state affirmatively acts to remove a child from the custody of one parent and then places the child with another parent, *DeShaney* does not foreclose constitutional liability." *Currier*, 242 F.3d at 919. *See also Freeman v. Ferguson*, 911 F.2d 52, 55 (8th Cir. 1990) (*DeShaney* "establishes the possibility that a constitutional duty to protect an individual against private violence may exist in a non-custodial setting if the state has taken affirmative action which increases the individual's danger of, or vulnerability to, such violence beyond the level it would have been at absent state action.") (cited by the Tenth Circuit in *Armijo*, 159 F.3d at 1263).

¶ 49 In *Estate of B.I.C.*, the Tenth Circuit explained that *Currier* is limited to the proposition that a constitutional violation occurs only when state employees play a role in placing a child with another parent—i.e., not the same parent with whom the child would have been had the state not acted, as in *DeShaney*—and when the state, thus, plays a role in creating a danger which would not have existed had the state not intervened or affirmatively acted to place the child with the abusive parent. 761 F.3d at 1107.

¶ 50 The *Currier* Court explained as follows:

> To make out a proper danger creation claim, a plaintiff must demonstrate that (1) the charged state entity and the charged individual actors created the danger or increased plaintiff's vulnerability to the danger in some way; (2) plaintiff was a member of a limited and specifically defin-

able group; (3) defendants' conduct put plaintiff at substantial risk of serious, immediate, and proximate harm; (4) the risk was obvious or known; (5) defendants acted recklessly in conscious disregard of that risk; and (6) such conduct, when viewed in total, is conscience shocking.

242 F.3d at 918 (citation omitted).

¶ 51 Specifically, in *Currier*, in regard to one of the defendants (Doran) who, despite obvious signs of abuse, was responsible for the decision to grant the abusive father custody, the court explained that

> [t]he danger creation theory . . . focuses on the affirmative actions of the state in placing the plaintiff in harm's way. Plaintiffs cannot rely on Defendants' failure to intervene once custody was given to [the father] to state a danger creation claim . . . . Thus, we will only consider Doran's conduct before legal custody was given to [the father].

*Id.* at 919.

¶ 52 As to the first five elements of a danger creation theory applied to the actions of Doran, the court concluded:

> Doran's conduct meets the danger creation theory of liability. . . . Doran "created the danger or increased the plaintiff[s'] vulnerability to the danger" through his failure to investigate the numerous bruises and allegations of abuse and his responsibility for the court order granting legal custody to [the father]. *Armijo*, 159 F.3d at 1263; *see also Ford*, 899 F.Supp. at 233 (finding a

abuse to retain the child in state custody, while defendant social workers in the *Tazioly* case had actual knowledge that the biological mother was "unfit and dangerous." *Id.* at *9.

While language in the Seventh Circuit's opinion in *K.H. v. Morgan*, 914 F.2d 846, 852–53 (7th Cir. 1990), suggests that placing a child with a family member might insulate the state from constitutional liability, the Seventh Circuit seems to have since reconsidered its earlier dicta. In a recent case involving a suit brought against social workers as the result of injuries suffered while a child was abused at her father's home, the court stated that "[i]f the [social workers] knowingly placed [plaintiff] in a position of danger, they would not be shielded from liability by the decision in *DeShaney*." *Bank of Ill. v. Over*, 65 F.3d 76, 78 (7th Cir. 1995). Furthermore, the reasoning used by the Seventh Circuit in *Morgan* actually supports

constitutional liability when custody is transferred from one parent to another. The court stated that "[t]he state could have left [plaintiff] to the tender mercies of her parents without thereby violating her rights under the Constitution. But having removed her from their custody the state assumed at least a limited responsibility for her safety." *Morgan*, 914 F.2d at 849. Under this reasoning it would be arbitrary to allow the state to avoid this responsibility merely by placing the child with another relative. *See S.S. v. McMullen*, 225 F.3d 960, 968 (8th Cir. 2000) (en banc) (Gibson, J., dissenting) ("These distinctions . . . between foster parents and natural parents [] are arbitrary."), *petition for cert. filed*, 69 U.S.L.W. 3410 (U.S. Dec. 8, 2000) (No. 00–946)[, *cert. denied*, 532 U.S. 904, 121 S.Ct. 1227, 149 L.Ed.2d 137 (2001)]. *Currier*, 242 F.3d at 918–19.

constitutional claim was stated against defendant social workers who failed to investigate and report to juvenile court circumstances concerning father given custody of a child he subsequently beat to death). [Here, the children] were members "of a limited and specifically definable group": children the state has removed from their natural parent and taken into state custody. . . . By failing to investigate the allegations of child abuse and by recommending that [the father] assume legal custody, Doran's conduct put [the children] at obvious risk of serious, immediate, and proximate harm, a harm that Doran recklessly and consciously disregarded.

¶ 53 With regard to the sixth element, the court acknowledged: "It is a somewhat closer question whether Doran's conduct is 'conscience shocking.'" *Currier*, 242 F.3d at 919. Among the basic principles guiding this determination, the court noted "the general need for restraint," as well as the concern that such actions "not replace state tort law[.]" *Id.* However, the court discussed the facts presented in *Armijo*, which

involved a decision by school officials to send home a distraught and potentially suicidal student, when it was known that there were firearms present at his house and that his parents were not home, despite school disciplinary policy that prevented out-of-school suspensions when a student's parent was not home. *Armijo*, 159 F.3d at 1256-57. This court determined that this decision could be "construed as conscience-shocking, depending on context as determined after a full trial." *Id.* at 1264.

*Currier*, 242 F.3d at 920. The *Currier* Court then stated:

The allegations in Plaintiffs' complaint against Doran, if true, are at least as conscience-shocking as the facts in *Armijo*. It is important to remember that Doran's conduct must be "viewed in total," and thus the cumulative impression of Doran's conduct should be considered. *Id.* In light of the initial information Doran had about [the father's] financial irresponsibility, and in light of the numerous bruises and allegations of abuse, Doran's failure to investigate the bruises and allegations and his subsequent responsibility for the court order granting [the father] legal custody could be conscience shocking, depending, of course, on further context as provided by discovery. *See id.* Thus, Plaintiffs have alleged sufficient facts to support a danger creation claim against Doran.

*Currier*, 242 F.3d at 920.

¶ 54 Pursuant to *Currier*, genuine disputes of material fact exist regarding a "danger creation theory" against DHS. In the present case, and viewing the facts in a light most favorable to Plaintiffs on summary judgment, the child *was* placed in a worse position than that in which she would have been had the state not acted at all. In the present case, it appears the child never even knew her father (i.e., for the first four years of her life) until after she was removed from the custody of her mother and placed in the emergency custody of DHS. The child was introduced to her father while in the custody of DHS and in foster care, and the various indications of the father's abusive tendencies toward the child became manifest following his visitations with the child and while the child was otherwise living with a foster family. Despite the fact that DHS knew or should have known that the child was a special needs child who had a pace maker; despite the fact that it became apparent that Brooks was abusing the child during his visitation periods with the child; despite the fact that Brooks was, among other things, inflicting severe injuries near the child's pace maker and leaving scars and bruises on other parts of the child's face and body; despite the fact that other DHS workers and the foster parents raised multiple concerns on multiple occasions regarding Brooks, including the fact that the child was terrified of Brooks; *nevertheless*, the DHS workers knowingly withheld all this information from the court and recommended placement of the child with Brooks. Viewing the facts in their present, undeveloped state, we conclude genuine disputes of material fact exist and that summary judgment was improperly granted.

¶ 55 There can be no doubt that, as to children in state custody, Oklahoma's due process clause prevails over the GTCA with

regard to placement decisions that are made recklessly in conscious disregard of a known or obvious risk of serious, immediate, and proximate harm to the child. Where state actors, acting within the scope of their employment, create a danger to a child in state custody, or increase a child's vulnerability to a danger in some way; where the state's conduct puts a child at *substantial risk of serious, immediate, and proximate harm*; where the risk was *obvious or known*; where defendants acted *recklessly in conscious disregard of that risk*; and where such conduct, *when viewed in total, is conscience shocking*, respondeat superior serves as a basis for liability against DHS under a cause of action arising from the due process clause of the Oklahoma Constitution. *See Bosh*, ¶32.[12]

## CONCLUSION

¶ 56 "[E]stablished precedent" in Oklahoma has "refused to construe the [GTCA] as providing blanket immunity," especially where that immunity would "render the Constitutional protections afforded the citizens of this State as ineffective, and a nullity." *Bosh*, ¶23. Thus, although we affirm that portion of the trial court's Order finding that a cause of action under the GTCA is unavailable, we reverse the trial court's award of summary judgment because genuine disputes of material fact remain regarding a possible violation of the child's constitutional rights under the due process clause of the Oklahoma Constitution. In particular, disputes of fact exist as to whether certain DHS employees, acting within the scope of their employment, acted recklessly in conscious disregard of a known or obvious risk of serious, immediate, and proximate harm to the child, and whether their conduct, when viewed in total, is conscience shocking. We remand for further proceedings.

¶ 57 **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED FOR FURTHER PROCEEDINGS.**

THORNBRUGH, P.J., concurring specially:

¶ 1 I concur entirely with this opinion and its reasoning. I write separately only to emphasize two points: First, I emphasize the clear fact that the Oklahoma Constitution and its protections and restraints on state power are *above the statutory law.* Imposing no penalty for state-sponsored violations of fundamental constitutional rights would allow the state to act with complete impunity. The matter is very well stated in ¶23 of *Bosh*, as follows:

> The OGTCA cannot be construed as immunizing the state completely from all liability for violations of the constitutional rights of its citizens. To do so would not only fail to conform to established precedent which refused to construe the OGTCA as providing blanket immunity, but would also render the Constitutional protections afforded the citizens of this State as ineffective, and a nullity.

¶ 2 This simple truth cannot be evaded by urging a doctrine that a state actor automatically ceases to act with the authority of the state if he or she breaches a fundamental constitutional right of a citizen. *If an act is forbidden to the King, it may not be carried out by those acting on behalf of the King.*

¶ 3 Second, I write to note a current lack of clarity in the procedure regarding the type of claim presented in this case. If the OGTCA purports to grant the state immunity from violation of a fundamental constitutional right, a court may either (1) declare that the OGTCA immunity in this area is not absolute, or (2) declare that the OGTCA does grant absolute immunity, but that a cause of action is available outside the OGTCA. *Bosh* appears to take the latter view—that a claim resulting from the violation of a fundamental constitutional right "does not arise from the OGTCA," and hence represents a separate, common-law claim that is not subject to the

---

**12.** See also *Binette v. Sabo*, 244 Conn. 23, 710 A.2d 688 (1998), wherein the Supreme Court of Connecticut explained:

the United States Supreme Court [has] concluded that federal courts possess the power to create a private damages action directly under the federal constitution; *and the great majority of state courts that have considered the question have recognized their authority to do so under their state constitutions.*

*Id.* at 693 (emphasis added).

notice and limitations provisions of the OGT-CA. I note, however, that further procedural clarification of whether such claims are (or are not) subject to the various procedural requirements of the OGTCA would be of enormous value to the judges and practitioners in state courts.