**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 3, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

DONALD JOE GUTTERIDGE, JR., as
limited guardian of D.C., a minor child,

     Plaintiff - Appellant,

v.

STATE OF OKLAHOMA; OKLAHOMA
DEPARTMENT OF HUMAN SERVICES;
BETHANIE KUZMA, an individual;
SHANNON MCELROY, an individual;
SCOTT BATISTE, an individual; MISTY
JENNINGS-NELSON, an individual;
BETTY JOHNSON, an individual; RENEE
FIELDS, an individual; REGINA
BENSON, an individual,

     Defendants - Appellees,

No. 16-6321

_____

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 5:13-CV-00816-C)**
_____

Michael L. Brooks, The Brooks Law Firm, Oklahoma City, Oklahoma (David W. Van
Meter, Van Meter Law Firm, Oklahoma City, Oklahoma, Charles J. Watts, and Ellen M.
Watts, Oklahoma City, Oklahoma, with him on the briefs), for Plaintiff-Appellant.

John K.F. Langford (Emily B. Fagan, with him on the brief), Oklahoma Department of
Human Services, Oklahoma City, Oklahoma, for Defendants-Appellees.
_____

Before **KELLY**, **MURPHY**, and **MORITZ**, Circuit Judges.
_____

**MORITZ**, Circuit Judge.

_____

Plaintiff Donald Gutteridge, Jr. appeals the district court's order granting summary judgment to the defendants on two claims arising from injuries suffered by D.C., a child who was then in Oklahoma's foster-care system.

We agree with the district court that the individual defendants are entitled to qualified immunity on Gutteridge's 42 U.S.C. § 1983 claim. Likewise, we agree that Gutteridge's state-law tort claim is barred to the extent it arises from D.C.'s placement in two different foster homes. Accordingly, we affirm in part. But to the extent Gutteridge's state-law law claim instead arises from the alleged failure to timely remove D.C. from one of those homes and the alleged failure to provide D.C. with timely medical care for injuries she suffered there, the placement exemption doesn't apply. Thus, we reverse in part and remand for further proceedings.

**I**

D.C. is a minor child who was born in April 2008. Soon thereafter, she was diagnosed with cerebral palsy. Gutteridge is her limited guardian.

In 2010, the Oklahoma Department of Human Services (OKDHS) removed D.C. from the home of her biological parents and placed her in the foster-care home of Carolyn Funk. While there, D.C. suffered an unexplained shoulder fracture. OKDHS removed D.C. from Funk's home pending an investigation. But it returned D.C. to the Funk home after concluding that any allegations of abuse were unsubstantiated.

2

A few months later, D.C.'s biological father reported to OKDHS that Funk had allowed D.C. to fall backward and hit her head in the bathtub in order to teach D.C. not to lean back in the tub. And approximately seven months after that, OKDHS learned of severe bruising and a raised knot on D.C.'s forehead. OKDHS again investigated and again found no evidence of neglect or abuse. Nevertheless, OKDHS immediately removed D.C. from Funk's home at Funk's request.

OKDHS then placed D.C. in the foster-care home of Pat LeBarre. Approximately two weeks later, LeBarre noticed D.C. having what appeared to be a seizure. After LeBarre reported D.C.'s condition to OKDHS, LeBarre and an OKDHS employee took D.C. to a local doctor's office. D.C. was then transported to a hospital, where testing revealed injuries consistent with abusive head trauma. OKDHS later concluded that this head trauma—which ultimately resulted in permanent brain damage—was the result of abuse or neglect that D.C. suffered while in LeBarre's care.

D.C.'s biological father brought suit in state court against OKDHS and several of its employees. After the defendants removed the action to federal court, Gutteridge substituted himself as the plaintiff and filed an amended complaint. As relevant here, Gutteridge asserted two claims: (1) a state-law tort claim against OKDHS; and (2) a § 1983 claim against OKDHS employees Bethanie Kuzma, Shannon McElroy, Scott Batiste, Misty Jennings-Nelson, Betty Johnson, Renee Fields, and Regina Benson (the individual defendants), alleging they violated D.C.'s substantive due process rights.

The individual defendants and OKDHS moved for summary judgment. In relevant part, the individual defendants asserted that they are entitled to qualified immunity. And OKDHS argued that it's exempt from liability under Oklahoma's Governmental Tort Claims Act (GTCA). *See* Okla. Stat. Ann. tit. 51, § 155(29) ("The state or a political subdivision shall not be liable if a loss or claim results from . . . [a]ny claim based upon an act or omission of an employee in the placement of children.").

The district court agreed on both counts. First, in concluding that the individual defendants are entitled to qualified immunity, it ruled that Gutteridge failed to establish a Fourteenth Amendment violation because the individual defendants' actions don't "shock the conscience." App. vol. 22, 1767. Second, it ruled that Gutteridge's state-law claim against OKDHS is indeed barred because it arises from D.C.'s "placement" with Funk and LeBarre. Okla. Stat. Ann. tit. 51, § 155(29). Accordingly, the district court granted summary judgment to the individual defendants and to OKDHS. Gutteridge appeals.

## II

### A

Gutteridge first argues that the district court erred in ruling that the individual defendants are entitled to qualified immunity on his § 1983 claim. We review de novo the district court's order granting summary judgment to the individual defendants on qualified-immunity grounds. *Felders ex rel. Smedley v. Malcom*, 755 F.3d 870, 877 (10th Cir. 2014).

4

"The doctrine of qualified immunity shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mullenix v. Luna*, 136 S. Ct. 305, 308 (2015) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). "When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff, who must clear two hurdles in order to defeat the defendant's motion." *Riggins v. Goodman*, 572 F.3d 1101, 1107 (10th Cir. 2009). First, "[t]he plaintiff must demonstrate on the facts alleged . . . that the defendant violated his [or her] constitutional or statutory rights." *Id.* Second, the plaintiff must demonstrate "that the right was clearly established at the time of the alleged unlawful activity." *Id.* "If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment—showing 'that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law.'" *Nelson v. McMullen*, 207 F.3d 1202, 1206 (10th Cir. 2000) (quoting *Albright v. Rodriguez*, 51 F.3d 1531, 1535 (10th Cir. 1995)).

Here, the district court concluded that Gutteridge's § 1983 claim faltered at the first of these two hurdles: it ruled that Gutteridge failed to demonstrate the individual defendants violated D.C.'s substantive due process rights under the Fourteenth Amendment. For the reasons discussed below, we agree.

"[S]tate actors are generally only liable under the Due Process Clause for their own acts and not for private violence . . . ." *Uhlrig v. Harder*, 64 F.3d 567, 572 (10th Cir. 1995). Thus, the individual defendants typically wouldn't be liable for any acts

5

of "private violence" that Funk or LeBarre may have perpetrated against D.C. while she was in their care. *Id.* But "there are two recognized . . . exceptions" to this general rule: "(1) the special relationship doctrine; and (2) the 'danger creation' theory." *Id.* Gutteridge relies on the first of these two exceptions here.

The special-relationship doctrine "protects individuals"—including foster children—"who involuntarily enter state custody and subsequently become reliant on the State, through its agencies and officials, to provide their basic human needs, paramount among those safety." *Schwartz v. Booker*, 702 F.3d 573, 585 (10th Cir. 2012); *see also id.* at 580 ("[F]oster care is recognized as one of the custodial relationships that creates a special relationship."). This "special relationship triggers a continuing duty" that "is subsequently violated if a state official 'knew of the asserted danger to [a foster child] or failed to exercise professional judgment with respect thereto, . . . and if an affirmative link to the injuries [the child] suffered can be shown.'" *Id.* at 580 (alterations in original) (quoting *Yvonne L. ex rel. Lewis v. N.M. Dep't of Human Servs.*, 959 F.2d 883, 890 (10th Cir. 1992)).

But as the district court pointed out, it appears this court requires more than a state official's mere failure to exercise professional judgment; instead, to sustain a claim under the special-relationship doctrine, a plaintiff must demonstrate that the defendant "abdicated her professional duty *sufficient to shock the conscience*." *Schwartz*, 702 F.3d at 585–86 (emphasis added); *see also Cty. of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998) ("[T]he substantive component of the Due Process Clause is violated by executive action only when it 'can properly be characterized as

6

arbitrary, or conscience shocking, in a constitutional sense.'" (quoting *Collins v. City of Harker Heights*, 503 U.S. 115, 128 (1992))).

Here, the district court concluded that the individual defendants were "[no] more than negligent" in placing D.C. with LeBarre. App. vol. 22, 1767. And it reasoned that they were "at most reckless or negligent" in their dealings with Funk. *Id.* Thus, the district court ruled, the individual defendants' conduct doesn't "shock the conscience" and therefore can't form the basis of a special-relationship claim. *Id.*

On appeal, Gutteridge raises four challenges to this ruling. First, Gutteridge asserts that the district court erred in requiring him to demonstrate both that the individual defendants (1) failed to exercise professional judgment *and* (2) did so in a manner that shocks the conscience. Instead, Gutteridge asserts, a state employee's failure to exercise professional judgment vis-à-vis a foster child necessarily shocks the conscience. More specifically, Gutteridge argues, "abdication of professional judgment represents the degree of culpability that satisfies the conscience-shocking standard in the specific context of foster-care cases." Aplt. Br. 27; *cf. Lewis*, 523 U.S. at 850 ("[D]eliberately indifferent conduct" is "enough to satisfy the fault requirement for due process claims based on the medical needs of someone jailed while awaiting trial." (internal citations omitted)); *Bolmer v. Oliveira*, 594 F.3d 134, 143–45 (2d Cir. 2010) (indicating that substantial departure from medical standards in making involuntary-commitment decision is per se conscience-shocking for purposes of due process claim; reasoning that "medical-standards analysis . . . itself measures what is conscience shocking in this context").

7

At the outset, we question whether Gutteridge has preserved this argument for appeal. His opening brief fails to "cite the precise reference in the record where the issue was raised and ruled on." 10th Cir. R. 28.2(C)(2); *see also Harolds Stores, Inc. v. Dillard Dep't Stores, Inc.*, 82 F.3d 1533, 1540 n.3 (10th Cir. 1996) (declining to consider argument where appellant failed to provide record citation in opening brief establishing it raised argument below). Moreover, our review of the record suggests that Gutteridge may have actually invited the district court to apply the same approach he now seeks to challenge on appeal.

For instance, in his response to the individual defendants' motion for summary judgment, Gutteridge argued separately—and, in fact, in separate subsections—that (1) the individual defendants "failed to exercise professional judgment," App. vol. 8, 1035, and (2) their conduct shocks the conscience, *id.* at 1037. Likewise, he later acknowledged that to succeed on his § 1983 claim, he had to demonstrate that the individual defendants "abdicated [their] professional duty *sufficient to shock the conscience*." App. vol. 18, 1703 (emphasis added) (citing *J.W. v. Utah*, 647 F.3d 1006, 1011 (10th Cir. 2011)). And on appeal, Gutteridge recognizes that this very same "sufficient to shock the conscience" language, *id.*, could be read to suggest "that some failures to exercise professional judgment will not rise to the level of conscience shocking and that a plaintiff must make some showing in addition to a social worker's abdication of duty to satisfy the shocks-the-conscience standard." Aplt. Br. 28–29, 29 n.10.

8

In other words, Gutteridge relied on language below that he recognizes directly contradicts the position he now advances on appeal. Thus, we could treat his argument as waived and decline to consider it, either because Gutteridge fails to demonstrate he raised the argument below and fails to argue for plain error on appeal, *see Richison v. Ernest Grp., Inc.*, 634 F.3d 1123, 1131 (10th Cir. 2011), or because Gutteridge affirmatively invited any error that may have occurred, *see United States v. LaHue*, 261 F.3d 993, 1013 (10th Cir. 2001) (applying invited-error doctrine where "defendants' argument on appeal [wa]s a complete reversal from the position they" advanced below).

Alternatively, even if we assume this argument is properly before us, it fails on the merits. In *Johnson ex rel. Estate of Cano v. Holmes*, 455 F.3d 1133 (10th Cir. 2006), we first articulated the relevant test as a bifurcated one: we indicated that to make out a claim under the special-relationship doctrine, (1) a plaintiff must demonstrate "an abdication of professional responsibility," and (2) "[s]uch abdication must be sufficient to shock the conscience." *Id.* at 1143. But we then reversed the district court's order granting summary judgment to one of the defendants based solely on our conclusion that a reasonable jury could determine she failed to exercise her professional judgment; we didn't then separately address whether her failure to exercise professional judgment also shocked the conscience. *Id.* at 1145. And as Gutteridge points out, "[i]f the plaintiff had to make some showing beyond failure to exercise professional judgment to demonstrate that the defendant's conduct shocked

9

the conscience, one would have expected the [c]ourt to address this additional requirement before reversing summary judgment for the defendant." Aplt. Br. 29.

Nevertheless, another aspect of our opinion in *Johnson* suggests that the district court correctly required Gutteridge to show not only that the individual defendants failed to exercise professional judgment, but that their failure to do so shocks the conscience.

In *Johnson*, the district court instructed the jury that before it could find for the plaintiffs under the special-relationship doctrine, it had to conclude both that (1) the defendants "failed to exercise professional judgment"; *and* (2) the defendants' "acts and omissions were conscience shocking." Brief for Appellant, *Johnson*, 455 F.3d 1133 (No. 04-2286), 2005 WL 6090396, at *51. On appeal, the plaintiffs challenged this instruction, arguing that it "misstated the applicable law by requiring the jury to find that [the defendants'] actions 'shocked the conscience.'" *Johnson*, 455 F.3d at 1141. And in doing so, the plaintiffs raised an argument similar to the one Gutteridge advances here: they asserted "that '[the failure to exercise] professional judgment' and not conduct that 'shocks the conscience' is the appropriate standard [of culpability] to have applied" to their special-relationship claim. Brief for Appellant, *Johnson*, 455 F.3d 1133 (No. 04-2286), 2005 WL 6090396, at *56.

We rejected this argument, concluding that the jury instruction—which treated the conscience-shocking nature of the defendants' conduct as a separate, additional element of the plaintiffs' due process claim under the special-relationship doctrine— "correctly stated the law." *Johnson*, 455 F.3d at 1142. And this conclusion squares

10

with the language of our more recent cases. For instance, in *J.W.*, we again articulated the relevant test as having two parts. "The applicable standard," we said, "'requires an abdication of such professional responsibility,' *and* '[s]uch abdication must be sufficient to shock the conscience.'" 647 F.3d at 1011 (emphasis added) (alteration in original) (quoting *Johnson*, 455 F.3d at 1143).

As Gutteridge acknowledges, we had no occasion to apply the second part of this test in *J.W.*[1] But we subsequently articulated and applied both parts of that two-part test in *Schwartz*. There, we explained that to "be held liable" under the special-relationship doctrine, the defendant must have "failed to exercise professional judgment . . . ; *moreover*, her conduct must shock the conscience." *Schwartz*, 702 F.3d at 583 (emphasis added). We then affirmed the district court's order refusing to dismiss the plaintiffs' special relationship claim. But we did so only after concluding that "the facts alleged could be a conscience-shocking abdication of duty." *Id.* at 576, 587–88. Finally, while certainly not dispositive, dicta in our recent decision in *Dahn v. Amedei* confirms that the conscience-shocking nature of defendant's conduct is a separate and distinct element of a special-relationship claim. *See* 867 F.3d 1178, 1185–86 (10th Cir. 2017) (listing failure to exercise professional judgment and conscience-shocking nature of conduct as second and fourth elements of special-relationship claim, respectively).

---

[1] Instead, we affirmed the district court's order granting summary judgment to the defendant because the plaintiffs failed to demonstrate she abdicated her professional responsibilities. *J.W.*, 647 F.3d at 1011.

11

Taken together, *Johnson*, *J.W.*, and *Schwartz* indicate that a plaintiff must separately demonstrate the conscience-shocking nature of a defendant's conduct in order to mount a successful special-relationship claim. We remain bound by these decisions. *See United States v. Little*, 829 F.3d 1177, 1181 (10th Cir. 2016). Accordingly, we hold that the district court didn't err in requiring Gutteridge to show both that (1) the individual defendants failed to exercise professional judgment; and (2) their actions shock the conscience.

Next, Gutteridge argues that even assuming he must make this two-part showing, "the [individual defendants'] conduct here would surely cross the necessary culpability threshold." Aplt. Br. 41. But we aren't convinced that the individual defendants failed to exercise their professional judgment, let alone that they did so in a manner that shocks the conscience.

The individual defendants in this case didn't fail to investigate radical changes to D.C.'s home life. *Cf. Johnson*, 455 F.3d at 1145–46 (reversing order granting summary judgment to defendant who "did not investigate" various changes to child's home life and who, "over a two-month span, did not make a single visit to" child's home). Nor did they fail to investigate allegations that LeBarre or Funk were abusing D.C. *Cf. Schwartz*, 702 F.3d at 588 ("[F]ailing to investigate the child abuse referrals and dismissing [foster child's] case without investigation was an abdication of duty that would violate [foster child's] substantive due process right to be reasonably safe from harm . . . .").

12

On the contrary, Gutteridge concedes that OKDHS investigated both D.C.'s shoulder fracture and the facial bruising that she suffered immediately before her removal from Funk's home. And he doesn't suggest that the individual defendants ever received any reports that LeBarre was abusing D.C. Under these circumstances, the individual defendants' conduct doesn't shock the conscience, even assuming they abdicated their professional duties by placing D.C. in, or failing to timely remove her from, the Funk or LeBarre homes. *See Schwartz*, 702 F.3d at 583 ("[A] social worker who simply makes a mistake of judgment under what are admittedly complex and difficult conditions will not find herself liable in damages under § 1983." (quoting *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189, 211 (1989) (Brennan, J., dissenting))); *Johnson*, 455 F.3d at 1142 ("[Defendant] exercised her professional judgment in her investigation of abuse allegations and, thus, did not violate [child's] substantive due process rights.").

It does appear that the individual defendants never investigated the allegation that Funk allowed D.C. to fall backward in the tub and hit her head. But even assuming this failure to investigate amounted to an abdication of the individual defendants' official duties, it doesn't shock our conscience. *See Schwartz*, 702 F.3d at 586 ("Conduct is shocking to the conscience when the 'degree of outrageousness and . . . magnitude of potential or actual harm . . . is truly conscience shocking.'" (quoting *Armijo ex  rel. Chavez v. Wagon Mound Pub. Sch.*, 159 F.3d 1253, 1262 (10th Cir. 1998))).

13

Nor do any of Gutteridge's remaining allegations shock our judicial conscience, e.g., that the individual defendants were aware LeBarre "had been illegally spanking foster children," App. vol. 22, 1767, or that they failed to seek medical treatment for D.C.'s facial bruising when they removed her from Funk's home. As the individual defendants point out, Gutteridge doesn't dispute that D.C.'s father and stepmother first noticed the bruising on September 15, 2011. D.C. was then seen at a medical facility the very next day for what was apparently a physical-therapy appointment. The notes from that appointment make no mention of D.C.'s bruising; on the contrary, they indicate that D.C. seemed very happy. Thus, any failure to seek medical treatment for D.C. nearly two weeks later doesn't shock the conscience, at least in the absence of some indication that D.C.'s condition had visibly deteriorated by then.

Finally, our conclusion that the individual defendants' conduct doesn't shock the conscience necessarily disposes of Gutteridge's two remaining challenges to the district court's order granting summary judgment to the individual defendants. Gutteridge argues that the district court erred in (1) failing to consider "testimony by other professionals" indicating that the individual defendants "abdicated their professional judgment," Aplt. Br. 36, 38; and (2) suggesting that reckless behavior can never shock the conscience in this context.

Even assuming the district court erred in failing to consider certain evidence and but for that error the district court would have concluded that the individual defendants abdicated their professional duties, the individual defendants would

14

nevertheless be entitled to qualified immunity based on Gutteridge's failure to demonstrate their conduct shocks the conscience. Thus, any error in failing to consider that evidence was harmless. For similar reasons, so too was any error the district court may have committed by suggesting that reckless behavior can never shock the conscience. Even assuming that some reckless conduct can shock the conscience, the individual defendants' conduct here does not. Accordingly, we affirm the district court's order granting summary judgment to the individual defendants on Gutteridge's § 1983 claim.

## B

Gutteridge next challenges the district court's order granting summary judgment to OKDHS on his state-law tort claim. According to Gutteridge, his claim is premised on allegations that OKDHS (1) negligently placed D.C. in both the Funk home and the LeBarre home; (2) negligently failed to timely remove D.C. from the Funk home; and (3) negligently failed to provide D.C. with medical care for her facial bruising.

Gutteridge concedes that state law bars his tort claim to the extent it arises from D.C.'s placement with Funk and LeBarre; under the GTCA, "[t]he state or a political subdivision shall not be liable if a loss or claim results from . . . [a]ny claim based upon an act or omission of an employee in the placement of children." Okla. Stat. Ann. tit. 51, § 155(29). But Gutteridge insists that the GTCA's placement exemption (the Exemption) doesn't apply to his two remaining theories of liability.

15

We exercise de novo review over this argument, *see United States v. Johnson*, 941 F.2d 1102, 1111 (10th Cir. 1991), and construe the Exemption "restrictively," *Holt v. State ex rel. Okla. Dep't of Transp.*, 927 P.2d 57, 61 (Okla. Civ. App. 1996) (explaining that "object of [GTCA] was to make State and its political subdivisions liable in tort, except where the Legislature *specifically and explicitly* provided exemptions from liability").

i

To the extent that Gutteridge's state-law claim arises from OKDHS' failure to provide D.C. with timely medical care, we agree with him that the Exemption doesn't apply. Viewing the Exemption "restrictively," as we must under *Holt*, 927 P.2d at 61, we simply can't see how the failure to seek medical care for D.C. might have anything to do with her "placement."[2] Okla. Stat. Ann. tit. 51, § 155(29); *see also Taylor v. Okla. ex rel. Dep't of Human Servs.*, No. 07-CV-380-GKF-PJC, 2008 WL 268333, at *4 (N.D. Okla. Jan. 29, 2008) (ruling that claim arising from OKDHS' "failure . . . to seek medical treatment [for child] following allegations of abuse" wasn't based upon act or omission in child's placement).

OKDHS suggests that we can nevertheless affirm the district court's order granting it summary judgment on Gutteridge's medical-care claim because, even

---

[2] Notably, the district court never explicitly concluded otherwise. It initially acknowledged that Gutteridge's state-law claim was premised, in part, on OKDHS' alleged failure to provide D.C. with timely medical care. But in analyzing whether the Exemption applies, the court addressed only Paragraphs 45(D), 46(A), and 46(D) of the operative complaint; it didn't discuss Paragraph 45(E) or Paragraph 46(E), which discuss OKDHS' alleged failure to provide D.C. with timely medical care.

16

assuming the Exemption doesn't apply, that claim is time-barred. In support, OKDHS asserts that the claim arises from injuries that D.C. suffered prior to October 2, 2011—more than a year before OKDHS received written notice of the claim. *See* Okla. Stat. Ann. tit. 51, § 156(B) ("A claim against the state or a political subdivision shall be forever barred unless notice thereof is presented within one (1) year after the loss occurs.").

But as Gutteridge points out, the loss he seeks to recover for under this claim isn't the injury that allegedly caused D.C. to need medical care in the first place—an injury that he concedes occurred sometime before September 15, 2011. Instead, Gutteridge seeks to recover for the injury that allegedly resulted in part from OKDHS' failure to provide that medical care: D.C.'s permanent brain damage.[3] And because it appears that particular loss didn't occur until sometime after October 2, 2011, *see id.* § 152(8), (defining "loss," in relevant part, as "injury to the body"), Gutteridge's medical-care claim isn't "forever barred," *id.* § 156(B); *see also Bentley v. Kirk*, 348 P.3d 1112, 1116 (Okla. Civ. App. 2015) ("The date of an *act of negligence* and the date of an *actual resulting loss* are not necessarily the same. Had the Legislature wished to start the one-year period on the date of the negligence or

---

[3] We question whether the record contains any evidence of a causal link between (1) the injuries that D.C. suffered while in Funk's care or OKDHS' subsequent failure to seek medical care for those injuries and (2) D.C.'s ultimate brain damage. But OKDHS doesn't cite the absence of such evidence as a basis for treating Gutteridge's state-law claim as untimely. Accordingly, we won't address whether such record evidence exists or whether the absence of such evidence would bar Gutteridge's state-law claim under Okla. Stat. Ann. tit. 51, § 156(B).

other tortious act, it could have stated so."). Accordingly, we reverse the district court's order granting summary judgment to OKDHS on that claim.

**ii**

Gutteridge's assertion that OKDHS negligently failed to timely remove D.C. from the Funk home presents a slightly closer question. In granting OKDHS summary judgment on this claim, the district court reasoned that any allegations involving (1) OKDHS' failure to remove D.C. from the Funk home or (2) OKDHS' decision to return D.C. to the Funk home after its investigation into D.C.'s shoulder fracture arise from OKDHS' decision to *continue D.C.'s placement* with Funk. And the district court agreed with OKDHS that any "semantic distinctions" between failing to remove D.C. from the Funk home and continuing D.C.'s placement there are insufficient to place this claim beyond the Exemption's reach. App. vol. 22, 1769.

We can see how the district court might reach this conclusion. Alleging that OKDHS was negligent in failing to remove D.C. from the Funk home could be construed as nothing more than an alternative way of alleging that OKDHS was negligent in continuing her placement there. And the Exemption indisputably applies to any claims arising from D.C.'s "placement." Okla. Stat. Ann. tit. 51, § 155(29). But as Gutteridge points out, his failure-to-remove claim arises from acts and omissions that allegedly occurred *after* OKDHS both (1) initially placed D.C. in the Funk home and (2) had a subsequent opportunity to intervene on D.C.'s behalf. Gutteridge argues that under these circumstances, the Oklahoma Court of Civil

18

Appeals' recent decision in *Deal v. Brooks*, 389 P.3d 375, 382–83 (Okla. Civ. App. 2016), places his failure-to-remove claim outside the Exemption.[4]

In *Deal*, OKDHS placed a foster child with her biological father on May 11, 2011. *Id.* at 382. He murdered her less than a month later. *Id.* at 380, 382. The child's grandparents brought suit, and OKDHS asserted it was exempt from tort liability under the Exemption. *Id.* at 380. The Oklahoma Court of Civil Appeals agreed. *Id.* at 381. In doing so, it noted that the plaintiffs' claims arose solely from conduct that "occurred prior to the decision to place the child with" her father, as opposed to "*after* the placement decision was made." *Id.* at 382. Likewise, the court pointed out, the child's death occurred less than a month after her placement and "prior to, for example, any scheduled review of the placement *or other opportunity to intervene.*" *Id.* at 383 (emphasis added). Thus, the court concluded, the Exemption barred the plaintiffs' claims. *Id.*

Here, on the other hand, Gutteridge's failure-to-remove claim arises from acts and omissions that allegedly occurred *after* D.C.'s placement in the Funk home; OKDHS concedes that (1) it placed D.C. in the Funk home on August 20, 2010; and (2) D.C.'s father noticed her facial bruising and swelling almost a year later, on September 15, 2011.[5] Moreover, these acts and omissions occurred not only after

---

[4] The Oklahoma Supreme Court ultimately released *Deal* for publication and accorded it precedential value. *Deal v. Brooks*, 2016 WL 7212486, at *1 (Okla. Aug. 4, 2016).

[5] According to Gutteridge, the injuries that led to this facial bruising and swelling—injuries that D.C. suffered while she was in Funk's care—contributed to D.C.'s ultimate brain damage.

19

OKDHS had an "opportunity to intervene," *id.*, but after OKDHS actually *did intervene*: it temporarily removed D.C. from the Funk home and then returned her after an investigation. In light of *Deal*'s emphasis on post-placement opportunities to intervene, *see id.*, and our obligation to construe the Exemption "restrictively," *Holt*, 927 P.2d at 61, we hold that the Exemption doesn't apply to Gutteridge's failure-to-remove claim, *see Brown v. Buhman*, 822 F.3d 1151, 1160 n.6 (10th Cir. 2016), *cert. denied*, 137 S. Ct. 828 (2017) ("[F]ederal courts must defer to states' interpretations of their own statutes.").[6] But we stress that we are not called upon today to define the outer contours of the phrase "opportunity to intervene" as used in *Deal*. 389 P.3d at 383. And we do not mean to suggest that the Exemption is inapplicable to all allegations of post-placement negligence. Instead, we hold only that, under *Deal*, the Exemption doesn't apply when the relevant acts or omissions occurred both (1) after the initial placement; and (2) after OKDHS actually intervened in that placement by removing the child from the home pending an investigation based on possible abuse and then returning the child to the home following the investigation.

Finally, like Gutteridge's medical-care claim, Gutteridge's failure-to-remove claim is also timely. True, any negligent failure to remove D.C. from the Funk home occurred more than one year before OKDHS received written notice of Gutteridge's

---

[6] *Deal* doesn't explicitly hold that when the alleged conduct occurs both after the initial placement and after a subsequent post-placement opportunity to intervene, the Exemption doesn't apply. But *Deal* indisputably indicates the court would have reached a different result but for the absence of such allegations. *See, e.g.*, 389 P.3d at 382, 383. In light of *Deal*'s broad language on this point and the deference we owe that decision, *see Brown*, 822 F.3d at 1160 n.6, we find it controlling.

20

claim. But the "loss" Gutteridge seeks to recover for, *see* Okla. Stat. Ann. tit. 51, § 152(8), isn't the facial bruising and swelling that D.C. suffered while in Funk's care; it's the permanent brain damage that D.C. suffered sometime after October 2, 2011—brain damage to which Gutteridge says the injuries that D.C. suffered while in Funk's care contributed. And because OKDHS received written notice of Gutteridge's failure-to-remove claim less than one year after D.C. suffered that brain damage, his claim isn't "forever barred." *Id.* § 156(B); *see also Bentley*, 348 P.3d at 1116.

For the reasons discussed above, we affirm the district court's order dismissing Gutteridge's state-law claim to the extent it arises from OKDHS' decisions to place D.C. with Funk and LeBarre. But we reverse the district court's order dismissing— and remand for further proceedings on—Gutteridge's state-law claim to the extent it instead arises from OKDHS' alleged failure to (1) obtain timely medical care for D.C. and (2) timely remove her from the Funk home.

## C

As a final matter, we grant Gutteridge's motion to seal Volumes 2, 5, 7, 13, 15, 17, 19, and 21 of the appendix; the material contained in these volumes "play[ed] no role in our resolution of this appeal." *Lenox MacLaren Surgical Corp. v. Medtronic, Inc.*, 847 F.3d 1221, 1246 n.14 (10th Cir. 2017).

But in that same motion Gutteridge also moved to seal Volumes 4, 9, 10, and 11 of the appendix. We ordered Gutteridge to address whether we should require him to (1) file an amended appendix and (2) narrow his sealing request to only those

21

documents containing private information that can't be reasonably redacted. In response, Gutteridge asserted that some of the documents in these volumes are confidential in their entirety under state law.

We agree those documents should remain under seal. *See Baxter Int'l, Inc. v. Abbott Labs.*, 297 F.3d 544, 546 (7th Cir. 2002). Yet Gutteridge's response fails to identify those documents with any particularity. Thus, we can't be sure whether the portions of Volumes 4, 9, 10, and 11 that have "play[ed a] role in our resolution of this appeal" are confidential under state law and should therefore remain under seal.[7] *Lenox MacLaren Surgical Corp.*, 847 F.3d at 1246 n.14. Accordingly, the court's April 10, 2017 order provisionally granting Appellant's Unopposed Motion for Leave to File Certain Volumes of Appellant's Appendix Under Seal is modified as follows. Gutteridge shall review the pages of the appendix cited above, *see supra* note 7, to determine whether (1) the entirety of those pages are confidential, or (2) the confidential information contained therein can be redacted so as to provide the public access to the record materials that informed the court's decision. Within 10 days of the date of this opinion, Gutteridge shall file a response identifying any of these pages that are confidential in their entirety, and attaching redacted versions of the pages that can reasonably be redacted.

---

[7] Those pages are App. vol. 4, 376–78; App. vol. 9, 1078–80, 1195; App. vol. 10, 1312, 1335, 1371, 1385; and App. vol. 11, 1196.

\* \* \*

The facts of this case are undeniably tragic. But we cannot say the individual defendants' conduct—even assuming it amounts to an abdication of professional duty—is so "outrageous[]" as to be "truly conscience shocking." *Schwartz*, 702 F.3d at 586 (quoting *Armijo*, 159 F.3d at 1262). Accordingly, we agree with the district court that the individual defendants are entitled to qualified immunity. And we therefore affirm its order granting summary judgment to them on Gutteridge's § 1983 claim. Likewise, to the extent that Gutteridge's state-law claim arises from D.C.'s placement in the Funk or LeBarre homes, we agree the Exemption applies and affirm the district court's order granting summary judgment to OKDHS. But to the extent that Gutteridge's state-law claim instead arises from allegations that OKDHS (1) failed to obtain timely medical care for D.C. and (2) failed to timely remove her from the Funk home, that claim is neither time-barred nor subject to the Exemption. Accordingly, we reverse in part the district court's order granting summary judgment to OKDHS and remand for further proceedings.