**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

_____

**April 21, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

LATARA DURAND, individually,

    Plaintiff - Appellant,

v.

MARI SHULL, individually,

    Defendant - Appellee,

and

MICHELLE BARNES, Executive
Director, Colorado Department of Human
Services, in her official capacity; ANDERS
JACOBSON, Director, Colorado Division
of Youth Services, in his official capacity,

    Defendants.

No. 21-1180
(D.C. No. 1:19-CV-01438-LTB-STV)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **BACHARACH**, **BRISCOE**, and **ROSSMAN**, Circuit Judges.
_____

---

[*] After examining the briefs and appellate record, this panel has determined unanimously to honor the parties' request for a decision on the briefs without oral argument. *See* Fed. R. App. P. 34(f); 10th Cir. R. 34.1(G). The case is therefore submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

In this civil rights action premised on a racially hostile work environment, Latara Durand appeals from a district court order that applied qualified immunity and granted summary judgment to her supervisor, Mari Shull.  Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## BACKGROUND

Durand is a Black female who worked as a Youth Services Specialist II at the Lookout Mountain Youth Services Center ("Lookout Mountain"), "an intensive secure treatment program for male juvenile offenders."  Aplt. App., Vol. I at 62.  Her "role at Lookout Mountain was similar to a guard at a correction center for youths who had committed crimes."  *Id.*, Vol. II at 50.  Durand was assigned to Lookout Mountain's Spruce housing unit.

Shull was Lookout Mountain's Assistant Director.  In that position, she exercised supervisory authority over the Spruce and Juniper West units.

On May 22, 2017, an inmate referred to as "John Doe" violently assaulted Durand as she escorted him back to his room in the Spruce unit for not following her instructions. *Id.* at 51.[1]  Durand "suffered a traumatic brain injury and cervical spine injury."  *Id.* at 52. Shull notified police, who charged Doe with assault.  Durand missed a week of work.

When Durand returned to Lookout Mountain on May 29, she was assigned to the Spruce unit's control desk, pursuant to doctors' medical restrictions.  The control desk

---

[1] Doe had a history of violence against other guards.  And hours before Doe's attack on Durand, he had been involved in two fights with male inmates.  Durand had intervened and stopped the second fight.

"maintains the traffic in the unit, acting as a hub for the direction and control of the inmates." *Id.* at 53. As part of her control desk duties, Durand had to "check on all inmates secured in their rooms every fifteen minutes." *Id.* "Doe was housed in seclusion and [Durand] was required to check on him every fifteen minutes" by looking through the glass window in the door to his room. *Id.* at 54; *see also id.*, Vol. I at 111.

Nearly every time that Durand checked on Doe, "he would stand at the window, glare at [her], yell at [her], and/or make threatening and harassing gestures, such as clenching his fists." *Id.*, Vol. II at 55. On an occasion when Doe was speaking with another juvenile, Durand overheard him call her "a black bitch and black ass N word." *Id.*, Vol. I at 125. On one or more other occasions, Durand heard Doe in the control room "state terms such as 'Black Bitch' and/or 'don't press charges.[']" *Id.*, Vol. II at 55.[2] Two weeks after she returned to work, Durand learned that Doe had threatened to "continue to assault" her and kill her if she pressed charges against him. *Id.*

Durand met with Shull to complain about Doe's behavior and threats. Durand asked Shull to transfer Doe to another unit, to excuse her from any contact with him, and to report him to the police. But Shull rejected her requests. Durand also asked Shull about applying for a promotion, which would have allowed her to be away from Doe, but "Shull was not supportive." *Id.* at 61.

---

[2] The evidence before us on appeal provides few details of the circumstances surrounding the racial slurs uttered by Doe.

On July 5, 2017, Durand met with Shull again and submitted a letter of resignation because she "did not feel safe at Lookout Mountain anymore." *Id.*, Vol. I at 114. Her last day was July 7.

Durand later sued Shull in her individual capacity and the Directors of Colorado's Human Services and Youth Services Departments. The "sole claim" at issue on appeal is that "Shull refused to act to protect her from exposure to . . . Doe, thus creating a hostile and abusive work environment which resulted in [Durand's] discriminatory constructive discharge," in violation of 42 U.S.C. §§ 1981, 1983, and the Equal Protection Clause. Aplt. Opening Br. at 1, 17. According to Durand, the hostile environment began when "she returned to work after her assault" and continued through her last day. Aplt. Reply Br. at 4.

The district court granted Shull summary judgment, concluding that she was entitled to qualified immunity because Durand failed to show a constitutional violation.

## DISCUSSION
### I. Standard of Review & Qualified Immunity

"We review de novo the district court's order granting summary judgment to [Shull] on qualified-immunity grounds." *Gutteridge v. Oklahoma*, 878 F.3d 1233, 1238 (10th Cir. 2018). "[Q]ualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* (internal quotation marks omitted).

"When a defendant asserts qualified immunity at summary judgment, the burden shifts to the plaintiff, who must clear two hurdles in order to defeat the defendant's

motion." *Id.* (internal quotation marks omitted).  The plaintiff must "show (1) a reasonable jury could find facts supporting a violation of a constitutional right, which (2) was clearly established at the time of the defendant's conduct." *Gutierrez v. Cobos*, 841 F.3d 895, 900-01 (10th Cir. 2016) (internal quotation marks omitted); *see also Prince v. Sheriff of Carter Cnty.*, 28 F.4th 1033, 1043 (10th Cir. 2022) (explaining that qualified immunity's first prong asks whether the plaintiff "has raised a genuine dispute of material fact such that a reasonable jury could find a [constitutional] violation").  "If, and only if, the plaintiff meets this two-part test does a defendant then bear the traditional burden of the movant for summary judgment—showing that there are no genuine issues of material fact and that he or she is entitled to judgment as a matter of law." *Gutteridge*, 878 F.3d at 1238 (internal quotation marks omitted).

"We have discretion to address the two qualified-immunity prongs in whatever order is appropriate under the circumstances." *Toevs v. Reid*, 685 F.3d 903, 910 (10th Cir. 2012).  In conducting our analysis, we "view the evidence, and all inferences arising from that evidence, in the light most favorable to the nonmoving party[;] . . . this usually means adopting the plaintiff's version of the facts." *Emmett v. Armstrong*, 973 F.3d 1127, 1130 (10th Cir. 2020) (ellipsis and internal quotation marks omitted).

We begin our analysis with the first qualified-immunity prong—whether there was a constitutional violation.

## II.  Hostile Work Environment

"One special type of discrimination claim is a claim that the defendant created a hostile work environment.  We will assume, without deciding, that such a claim can be

brought as a § 1983 claim based on both § 1981 and the Equal Protection Clause."

*Allstate Sweeping, LLC v. Black*, 706 F.3d 1261, 1266 (10th Cir. 2013).  We will also

assume, without deciding, that such a claim against a supervising authority, like Shull,

can be premised on a hostile work environment created by a third-party nonemployee.[3]

A plaintiff claiming a racially hostile work environment must show that "under the

totality of the circumstances (1) the harassment was pervasive or severe enough to alter

the terms, conditions, or privilege of employment, and (2) the harassment was racial or

stemmed from racial animus."  *Bolden v. PRC Inc.*, 43 F.3d 545, 551 (10th Cir. 1994)

(internal citations omitted).  Thus, to avoid summary judgment, "[Durand] must present

evidence that creates a genuine dispute of material fact as to whether [the Spruce unit at

---

[3] Durand does not claim that Shull herself created a hostile work environment. Indeed, Durand admitted during her deposition that neither Shull nor anyone else employed at Lookout Mountain made any remark about her race or took any action that referred to her race.  Aplt. App, Vol. I at 118-19.  Instead, Durand's claim is premised entirely on Doe's statements and conduct.  Although such a third-party hostile-work-environment claim has been recognized in the Title VII context, *see, e.g.*, *Lockard v. Pizza Hut, Inc.*, 162 F.3d 1062, 1072-74 (10th Cir. 1998), its applicability in the § 1981, § 1983 and equal-protection context is not entirely clear.

In particular, the liability theory under Title VII for a third-party hostile-work-environment claim is negligence, based on a "fail[ure] to remedy or prevent a hostile or offensive work environment of which management-level employees knew, or in the exercise of reasonable care should have known."  *Id.* at 1074 (internal quotation marks omitted); *see also Turnbull v. Topeka State Hosp.*, 255 F.3d 1238, 1244 (10th Cir. 2001) ("apply[ing] a negligence analysis" to a Title VII claim of "sexual harassment based upon the acts of nonemployees").

But "mere negligence is not enough to hold a supervisor liable under § 1983"; rather, "a plaintiff must establish that the supervisor acted knowingly or with deliberate indifference that a constitutional violation would occur."  *Serna v. Colo. Dep't of Corr.*, 455 F.3d 1146, 1151 (10th Cir. 2006) (internal quotation marks omitted).  Section 1981 also requires "purposeful discrimination."  *Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 391 (1982).

Lookout Mountain was] permeated with discriminatory intimidation, ridicule, and insult that [was] sufficiently severe or pervasive." *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1222 (10th Cir. 2015) (brackets and internal quotation marks omitted).[4]

## A.    Pervasive Racial Harassment

Durand identifies several instances in which she heard Doe call her a "Black Bitch," Aplt. App., Vol. II at 55, or a "black ass N word," *id.*, Vol. I at 125.  These racial slurs are undoubtedly offensive.  But pervasive harassment requires more than "a few isolated incidents of racial enmity or sporadic racial slurs." *Chavez v. New Mexico*, 397 F.3d 826, 832 (10th Cir. 2005) (internal quotation marks omitted).  "Instead, there must be a steady barrage of opprobrious racial comments." *Id.* (internal quotation marks omitted).

Nevertheless, "the existence of racial harassment must be determined in light of the record as a whole, and the trier of fact must examine the totality of the circumstances, including the context in which the alleged incidents occurred." *McCowan v. All Star Maint., Inc.*, 273 F.3d 917, 925 (10th Cir. 2001) (brackets and internal quotation marks omitted).  Durand contends that Doe's racial slurs must be considered alongside his "[f]acially neutral" threatening statements and gestures toward Durand.  Aplt. Opening Br. at 24.  Indeed, "when a plaintiff introduces evidence of both race-based and

---

[4] "Pervasiveness and severity are independent and equal grounds" for a claim of hostile work environment.  *Lounds*, 812 F.3d at 1222 (internal quotation marks omitted).  Although the district court phrased the standard as both "pervasive and severe" and "pervasive or severe," Aplt. App., Vol. II at 117, 118, our review is de novo, and we utilize only the disjunctive formulation.

race-neutral harassment, and when a jury, viewing the evidence in context, reasonably could view all of the allegedly harassing conduct as the product of racial hostility, then it is for the fact finder to decide whether such an inference should be drawn." *Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 960 (10th Cir. 2012) (brackets, ellipsis, and internal quotation marks omitted).

But here, Durand has not identified evidence that a reasonable jury could view as establishing a common thread of racial hostility between Doe's racially-neutral threats and gestures and his overtly racist statements. To the contrary, the record evidence indicates that Doe's hostility toward Durand was tied to the assault charges pending against him. *See, e.g.*, Aplt. App., Vol. II at 55 (Durand's declaration statement that when Doe was in the control room "talking with others" and she walked by, Doe would say "'Black Bitch' and/or 'don't press charges[']"); *id.* at 56 (Durand's declaration statement that Doe asked a counselor whether Durand "was pressing charges against him" and then threatened to "continue to assault [her] and kill [her] if [she] pressed charges against him").

Further, we cannot overlook the context of this case. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998) (requiring "careful consideration of the social context in which particular behavior occurs and is experienced by its target"); *Lounds*, 812 F.3d at 1223 (quoting *Oncale* and noting this court's similar requirement of "careful[ ] consider[ation] [of] each instance [of alleged harassment] as a component of the overall workplace milieu"). Lookout Mountain is a "juvenile criminal correctional facility." Aplt. App., Vol. I at 11. A probability of harassment is inherent in any such

8

setting. *See Slayton v. Ohio Dep't of Youth Servs.*, 206 F.3d 669, 677, 678 (6th Cir. 2000) (stating "it is beyond doubt that inmate conduct, without more, is an insufficient predicate for a hostile environment claim" because "[b]y choosing to work in a prison, corrections personnel have acknowledged and accepted the probability that they will face inappropriate and socially deviant behavior"; but finding a hostile work environment because the plaintiff's coworker "encouraged, endorsed, and even instigated the inmates' harassing conduct"); *see, e.g.*, *Vajdl v. Mesabi Acad. of KidsPeace, Inc.*, 484 F.3d 546, 550 (8th Cir. 2007) (citing *Slayton* and declining "[t]o impose liability [for a hostile work environment] upon [a juvenile corrections facility] for the inappropriate sexual expressions of severely troubled youth . . . without evidence of special circumstances").

Because this case arises from a corrections environment and involves evidence of isolated racial slurs, with facially-neutral threats and gestures not shown to be the product of racial hostility, we conclude that a reasonable jury could not find that Durand's work environment was infected with pervasive racial harassment.

## B.    Severe Racial Harassment

Isolated incidents of racial harassment can establish a hostile work environment if they are "especially egregious or extreme." *Morris v. City of Colo. Springs*, 666 F.3d 654, 667 (10th Cir. 2012). Durand argues that Doe's harassment satisfies this standard because he called her "Black Ass Nigger[ ] and Black Bitch" and threatened to continue assaulting her and to kill her. Aplt. Opening Br. at 29.

But we have already determined that a reasonable jury could not find a racial component in Doe's facially-neutral threats. Further, the corrections context in which

9

Doe uttered the racial slurs is highly relevant. Finally, while the use of "unambiguously raci[st]" words like "nigger" can in certain circumstances qualify as sufficiently severe to create a hostile work environment, *see, e.g.*, *Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1145 (10th Cir. 2008) (internal quotation marks omitted) (holding that severity was established by "various graffiti and cartoons combined with the words 'nigger' and 'nigger go home' etched on [employee's] locker"), the standard is not one of strict liability, *see, e.g.*, *Peters v. Renaissance Hotel Operating Co.*, 307 F.3d 535, 552 (7th Cir. 2002) (holding that co-worker's use of the word "nigger" in plaintiff's presence did not rise to the level of objectively hostile work environment). Durand's evidence indicates that Doe made one or more of his racist remarks to others, rather than directly to her. *See* Aplt. App., Vol. I at 125 (Durand's deposition testimony that she heard Doe say to another juvenile, "black bitch and black ass N word"); *id.*, Vol. II at 55 (Durand's declaration statement that Doe would say "Black Bitch" while in the control room "talking with others").

Given all of the circumstances of this case, we conclude that a reasonable jury could not find that Durand experienced objectively severe racial harassment that created a hostile work environment.[5]

---

[5] Because Durand has failed to raise a triable issue as to whether she endured a hostile work environment, her constructive-discharge claim necessarily fails. *See Williams v. W.D. Sports, N.M., Inc.*, 497 F.3d 1079, 1095 n.12 (10th Cir. 2007) (indicating that where claims of hostile work environment and constructive discharge are based on the "same allegations," the failure of the former renders harmless "any error in dismissing the [latter]"); *accord Perkins v. Int'l Paper Co.*, 936 F.3d 196, 212 (4th Cir. 2019) ("Because we have already concluded that [plaintiff] failed to

Although Durand's failure to show a constitutional violation is sufficient by itself to affirm the application of qualified immunity, *see A.M. v. Holmes*, 830 F.3d 1123, 1134-35 (10th Cir. 2016), even if she had established a hostile work environment, qualified immunity would still apply because she has not shown that the resulting constitutional violation was clearly established.

### III.  Clearly Established Law

In her opening brief, Durand addresses the clearly-established prong of qualified immunity by requesting a remand to the district court so it can consider the prong in the first instance.  In response, Shull presents the clearly-established prong as an alternative ground for affirmance and contends that remand is unnecessary, as the issue presents a question of law within our de novo review, *see Elder v. Holloway*, 510 U.S. 510, 516 (1994).  Given that Durand addresses the prong in her reply brief in response to Shull raising it as an alternative ground for affirmance, we will address the prong.  *See Shepard v. Quillen*, 840 F.3d 686, 693 n.8 (9th Cir. 2016) (addressing clearly-established prong in the first instance despite appellant's failure to discuss it in the opening brief, because the appellee urged its consideration).

"To qualify as clearly established, a constitutional right must be sufficiently clear that every reasonable official would have understood that what [s]he is doing violates that right."  *Redmond v. Crowther*, 882 F.3d 927, 935 (10th Cir. 2018) (internal quotation marks omitted).  "A case clearly establishes a right when a Supreme Court or Tenth

---

show he was subjected to a hostile environment, it necessarily follows that he cannot show constructive discharge.").

Circuit decision is on point, or if the clearly established weight of authority from other courts shows that the right must be as the plaintiff maintains." *Id.* (brackets and internal quotation marks omitted). We "must determine whether a right is clearly established in light of the specific context of the case, not as a broad general proposition." *Id.* (internal quotation marks omitted).

Durand defines the right at issue as the "right to be free from race discrimination in public sector employment" as "established in the Equal Protection Clause, and asserted through [s]ections 1981 and 1983." Reply Br. at 25. But "the Supreme Court has repeatedly highlighted the longstanding principle that clearly established law should not be defined at a high level of generality." *Frasier v. Evans*, 992 F.3d 1003, 1014 (10th Cir. 2021) (internal quotation marks omitted). And this is not a case in which "a general constitutional rule already identified in the decisional law . . . appl[ies] with obvious clarity to the specific conduct in question," *Taylor v. Riojas*, 141 S. Ct. 52, 53-54 (2020) (internal quotation marks omitted). In particular, this case seeks to impose personal liability against a state supervising officer for exposure to racial harassment committed by a nonemployee third party, where (1) there is no evidence the supervising officer had racist intent or engaged in any racist conduct; (2) the harassment was accomplished by an inmate in a corrections facility; and (3) the harassment was connected to the inmate's attempts to avoid criminal charges.

Durand makes no attempt to identify a case with similar facts. And although we are aware of third-party, hostile work environment, prison cases in the Title VII context, *see, e.g. Beckford v. Dep't of Corr.*, 605 F.3d 951, 958 (11th Cir. 2010) (collecting

12

cases), Durand has not pursued relief under Title VII, which involves a lesser-degree of intent than that which would apply here, *see supra* note 3.

Because Durand has not shown that Shull violated a constitutional right that was clearly established at the time she was exposed to Doe's harassment, Shull is entitled to qualified immunity.

## CONCLUSION

We affirm the district court's judgment.

Entered for the Court

Mary Beck Briscoe
Circuit Judge

21-1180, *Durand v. Barnes*
**ROSSMAN**, J., concurring.

I join in affirming the district court, but I rest my concurrence only on the clearly-established law prong as set forth in Part III of the Order & Judgment.