**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**May 10, 2022**

**Christopher M. Wolpert**
**Clerk of Court**

_____

THE ESTATE OF ANGEL PLACE,
Represented by Shane Place and Misty
Blackwell, Personal Representatives,

    Plaintiffs - Appellants,

v.

JOYCE ANDERSON; JONI BEDELL;
CRYSTAL STEWART,

    Defendants - Appellees.

No. 19-1269
(D.C. No. 1:16-CV-02286-JLK)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **HARTZ**, **MATHESON**, and **CARSON**, Circuit Judges.
_____

Angel Place cried. That fateful decision—such a commonplace event in the life of an eleven-month-old baby—ended in tragedy. For her offense, Angel's foster mother, Sydney White, violently shook Angel by the neck. Two days later, Angel died. White pleaded guilty to child abuse resulting in death and tampering with physical evidence. A Colorado state court sentenced White to 30 years' imprisonment.

_____

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

The present appeal arises from the civil side of Angel's killing. The personal representatives of her estate, Plaintiffs in this case, claim that three county human services workers violated Angel's Fourteenth Amendment substantive due process rights by allowing her placement with Sydney White and by later not removing Angel from White's home. Despite the ineffable fate Angel suffered, we agree with the district court that Plaintiffs' substantive due process claim against the social workers cannot survive summary judgment. Our jurisdiction arises under 28 U.S.C. § 1291. We affirm.

## I.

Angel Place was born on October 6, 2013. When she was not yet two-months old, the Mesa County Department of Human Services ("MCDHS") received a referral with concerns of Angel "rolling off the couch." MCDHS investigated Angel's home and concluded that it should remove Angel from it. On December 6, 2013, MCDHS placed Angel with a foster parent—Misty Blackwell. A Juvenile Court terminated Angel's biological parents' rights and declared her dependent or neglected.

At eight-months-old, Angel appeared to be developmentally on track both emotionally and socially. Angel also showed signs of bonding with Blackwell. But because Colorado's statutes give preference to placement of children with family "if such placement is in the child's best interest," MCDHS sought to move Angel into the care of family. Colo. Rev. Stat. § 19-3-508(b)(I). MCDHS contacted twelve family members. It identified Randy Bond, age 21—Angel's mother's cousin—and Sydney White, age 20—Bond's common law wife—as a potential family placement

for Angel.  Bond and White agreed to raise Angel and attended court hearings.
Blackwell, however, intervened in the juvenile court action and objected to any plans
to change Angel's placement.

A caseworker emailed his supervisor, Defendant Joni Bedell, to request a
home study on the Bond/White household.  Bedell assigned Defendant Joyce
Anderson the task of conducting the home study.  MCDHS completed that home
study on April 3, 2014.  The study found that White grew up in an extremely
dysfunctional home and that her parents had physically and emotionally abused her.
White also suffered from depression and anxiety and was socially isolated during the
day.  But the home study also stated that White had a strong commitment and
dedication to her children and husband and that she was very caring and attentive to
their needs.  The study also found that White and Bond maintained a clean, safe
home and that their two children—ages 2 and 10 months—had sufficient toys to play
with and clothes to wear.  MCDHS found them "very capable parents," demonstrated
through the parenting of their own children.  MCDHS concluded that Bond and
White were mature and savvy in handling their finances.  For example, Bond and
White bought their home and had twenty percent equity in the house.  Five different
independent references described White and Bond as generally attentive, responsible,
and involved parents.  Thus, despite evidence of White's abuse as a child, anxiety
and depression, and some aggression towards her mother, MCDHS ultimately
concluded that White and Bond could provide Angel a safe, loving home.  Anderson

concluded that MCDHS should place Angel in the Bond/White household. Bedell concurred.

MCDHS tasked Defendant Crystal Stewart, a senior case manager, with focusing on Angel and monitoring her foster home placement. On May 2, 2014, while Blackwell continued to care for Angel, Stewart reported that Angel was "a very happy baby" and "overall a healthy baby." MCDHS continued to believe that Angel should live in the Bond/White household.

On June 17, 2014, a state magistrate judge held a hearing to consider MCDHS's proposed transfer of Angel from Blackwell to Bond and White. In preparation for this hearing, MCDHS conducted an evaluation to assess Angel's developmental stage and her attachment to Blackwell to determine whether a transition to the Bond/White household would succeed. MCDHS concluded that both Blackwell and the Bond/White households were responsive and nurturing. The report stated that the transition could proceed as long as MCDHS completed it "immediately." At the hearing, Defendant Stewart testified that a placement in the Bond/White household would be in Angel's best interest. Notably absent as a witness at the hearing was Stephanie Schmid, a CASA representative. Before the hearing, she had expressed concern to the guardian ad litem about moving Angel from Blackwell to the Bond/White household. She believed that Angel would be safer with Blackwell and was upset with what was happening. She later testified in a deposition that she "didn't know what to do" and felt like she "was watching somebody fall over the cliff" while "shouting no" but no one could hear her. The

4

guardian ad litem, however, supported MCDHS's position to transition Angel to the Bond/White household. The magistrate judge ruled that MCDHS placing Angel in the Bond/White household under a transition plan was in Angel's best interest.

From June 17, 2014 through July 10, 2014, Angel transitioned from Blackwell's home to the Bond/White home. During the transition period, Blackwell reported signs of what she believed to be child abuse and neglect when Angel was residing in the Bond/White household. Blackwell reported that: Angel came back from the Bond/White household with a sunburn; Angel would often return dirty and hungry; Angel appeared lethargic after spending time with White; White refused to use medication Blackwell gave her for Angel; Angel had blood running from her ear; and Angel had a red mark under her right eye. Local law enforcement investigated the red mark under Angel's right eye. The officer wrote in his report that "there appeared to be a very small scratch and reddish area about the right eye which could have been made from the child's finger nails or by rubbing" and the "reddish area was barely visible." MCDHS investigated these incidents, but believed Blackwell made these reports because she did not want Angel to leave her care.

On July 11, 2014, Angel moved to the Bond/White household. Four days later, Sydney White notified Stewart that nine-month-old Angel had bruised her cheek by running into an island while playing tag. At this point, Angel was not yet crawling. Because Sydney White was not yet twenty-one-years-old, MCDHS had to obtain a written waiver, which waived the age requirement for Sydney to be a certified foster parent. MCDHS obtained this waiver on July 23, 2014.

Problems continued to mount.  On August 20, 2014, White told Stewart during a home visit that Angel was demanding more attention and that she was working on trying to help Angel adjust to less attention.  White talked about Bond's mother giving Angel "attention on demand" and constantly holding Angel, which caused Angel "to revert back to get attention."  Angel would cry hysterically "out of nowhere."  White described Angel's "attitude" as "demanding."  White told Stewart that she did not know what to do for Angel.

MCDHS scheduled the next home visit for September 16, 2014.  White called Stewart on September 15 and said she needed to cancel the visit because everyone in the family was sick.  Bond and White took Angel to a hospital on September 15.  Angel was unresponsive with right side jerking and flaccid left side.  Angel's head CT scan showed evidence of "acute subdural blood on the right with massive ischemic changes on the right . . . [and] [p]atchy changes on the left."  The radiology report stated that the findings were "highly suspicious for nonaccidental trauma (battered child syndrome)."

The hospital in Grand Junction, Colorado transferred Angel to Children's Hospital in Aurora, Colorado.  She died there on September 17, 2014 at eleven-months-old.

Angel's estate filed this civil action in the District of Colorado alleging Anderson, Bedell, and Stewart violated Angel's right to substantive due process.  Plaintiffs premised their due process claims on the "special relationship doctrine" and the "state created danger theory."  Plaintiffs also brought two statutory claims.

The district court granted summary judgment to Defendants.  It first concluded that the Rooker-Feldman doctrine—which precludes lower federal courts from effectively exercising appellate jurisdiction over claims actually decided by a state court and claims inextricably intertwined with a prior state-court judgment—prohibited it from evaluating whether MCDHS's placement decision was correct because a state court had concluded that the White/Bond placement was in Angel's best interest.  Because Plaintiffs based their substantive due process claims against Anderson and Bedell solely on the placement recommendation, the district court granted summary judgment for Anderson and Bedell.  As to Stewart's liability for alleged deficient monitoring of Angel's placement in the Bond/White household, the district court found that Stewart's conduct was reasonable under the attendant and known circumstances.  As a result, the district court granted summary judgment in Stewart's favor.

Angel's estate now appeals the district court's summary judgment rulings.

II.

Defendants contend that the Rooker-Feldman doctrine limits the claims in this case—limiting those that dispute that Angel's White/Bond placement was in her best interest.  The Rooker-Feldman doctrine derives from two Supreme Court cases—Rooker v. Fidelity Trust Co., 263 U.S. 413 (1923) and D.C. Court of Appeals v. Feldman, 460 U.S. 462 (1983)—and 28 U.S.C. § 1257.  Section 1257 provides that the Supreme Court may review final judgments of the highest state court in certain circumstances.  The Supreme Court has said the doctrine precludes lower federal

courts "from exercising subject-matter jurisdiction in an action it would otherwise be empowered to adjudicate under a congressional grant of authority," such as 28 U.S.C. § 1331. Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280, 291 (2005). Put simply, the "Rooker-Feldman doctrine merely recognizes that 28 U.S.C. § 1331 is a grant of original jurisdiction, and does not authorize district courts to exercise appellate jurisdiction over state-court judgments, which Congress has reserved to [the Supreme] Court." Verizon Md., Inc. v. Pub. Serv. Comm'n of Md., 535 U.S. 635, 644 n.3 (2002).

Some controversy exists—even within our circuit—as to whether a court may bypass a Rooker-Feldman issue when it can more easily resolve the case on the merits. Compare Yancey v. Thomas, 441 F. App'x 552, 555 n.1 (10th Cir. 2011) (declining to address Rooker-Feldman because the jurisdictional bar stems from a statute, not Article III of the Constitution), with Shell v. Meconi, 123 F. App'x 866, 867–68 (10th Cir. 2005) (holding the district court should have disposed of the case on Rooker-Feldman jurisdictional grounds before reaching the merits); see also Edwards v. City of Jonesboro, 645 F.3d 1014, 1017–18 (8th Cir. 2011) (noting conflicting decisions on whether a court must address Rooker-Feldman before addressing the merits). But we need not address that question today.

Rooker-Feldman applies to "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." Exxon Mobil Corp., 544 U.S. at 284 (2005). If a plaintiff presents an

8

independent claim in federal court, "albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party," the federal court has jurisdiction "and state law determines whether the defendant prevails under principles of preclusion." Id. at 293. In other words, Rooker-Feldman does not bar a federal-court claim merely because it seeks relief inconsistent with a state court judgment. Campbell v. Spencer, 682 F.3d 1278, 1283 (10th Cir. 2012).

Here, Plaintiffs do not seek review and rejection of the state juvenile court's order transferring Angel to White and Bond nor do they assert that the state court wrongfully entered its judgment. Rather, Plaintiffs seek relief independent from any judgment rendered by the state court. PJ ex rel. Jensen v. Wagner, 603 F.3d 1182, 1194 (10th Cir. 2010). Indeed, we routinely address claims alleging social worker liability based on theories inconsistent with state court judgments. See, e.g., Currier v. Doran, 242 F.3d 905, 915–20 (10th Cir. 2001); T.D. v. Patton, 868 F.3d 1209, 1225 (10th Cir. 2017). We accordingly reject Defendants' assertion that the Rooker-Feldman doctrine limits the claims in this case and proceed to the merits.

III.

"We review de novo a district court's grant of summary judgment" and "must view the factual record and make reasonable inferences therefrom in the light most favorable to the party opposing summary judgment." Bird v. W. Valley City, 832 F.3d 1188, 1199 (10th Cir. 2016). We uphold the district court's grant of summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

9

As described above, Angel's estate brought Fourteenth Amendment due process claims against three county human services workers: Anderson, Bedell, and Stewart. The Fourteenth Amendment's Due Process Clause provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV. And Congress passed 42 U.S.C. § 1983 to allow "an injured person to seek damages against an individual who has violated his or her federal rights while acting under color of state law." Davis v. Clifford, 825 F.3d 1131, 1134 (10th Cir. 2016). Defendants moved for summary judgment on Plaintiffs' constitutional claims, asserting that they were entitled to qualified immunity. Qualified immunity "shields public officials from damages actions unless their conduct was unreasonable in light of clearly established law." Id. Because Defendants claimed qualified immunity, Plaintiffs carry a two-part burden to show: "(1) that the defendant's actions violated a constitutional or statutory right, and if so, (2) that the right was clearly established at the time of the defendant's unlawful conduct." Id.

"A state actor generally may not be held liable under the Fourteenth Amendment for harm a private individual intentionally or recklessly inflicts upon a victim." Matthews v. Bergdorf, 889 F.3d 1136, 1143 (10th Cir. 2018) (citing DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. 189, 197 (1989)). The reasoning is simple enough: "Where private violence is responsible for the harm, the state actor has not deprived the victim of any constitutional right; rather the private individual has deprived the victim of life, liberty, or property." Id. Two exceptions

10

to this rule exist in our Circuit.  Id.  "Where a private party inflicts harm upon a victim, a state actor incurs an antecedent constitutional duty to protect the victim" if "a special custodial relationship" exists between the State and victim or "the state actor intentionally or recklessly created the danger that precipitated the deprivation." Id.

Plaintiffs posit Defendants deprived Angel Place of substantive due process rights under both exceptions to the general rule.  We first address the special relationship exception before turning to the state-created danger exception.

### A.

The special relationship doctrine applies "when the state assumes control over an individual sufficient to trigger an affirmative duty to provide protection to that individual."  Schwartz v. Booker, 702 F.3d 573, 579 (10th Cir. 2012).  Plaintiffs must establish four elements to succeed on the special relationship doctrine: (1) "the existence of a special relationship, meaning that the plaintiff completely depended on the state to satisfy basic human needs;" (2) "the defendant knew that the plaintiff was in danger or failed to exercise professional judgment regarding that danger;" (3) "the defendant's conduct caused the plaintiff's injuries;" and (4) "the defendant's actions must shock the conscience."  Dahn v. Amedei, 867 F.3d 1178, 1185–86 (10th Cir. 2017).

The special relationship's existence is "pivotal."  Id. at 1186.  Without it, "a state cannot be held liable for a person's injuries at the hands of a private third party as opposed to a state actor."  Id.  We have explicitly recognized that foster children

11

have a substantive due process right to protection while in foster care. Schwartz, 702 F.3d at 580. Thus, "foster care is recognized as one of the custodial relationships that creates a special relationship." Id. This special relationship "triggers a continuing duty which is subsequently violated if a state official 'knew of the asserted danger to [a foster child] or failed to exercise professional judgment with respect thereto, . . . and if an affirmative link to the injuries [the child] suffered can be shown.'" Schwartz, 702 F.3d at 580 (quoting Yvonne L. ex rel. Lewis v. N.M. Dep't of Human Servs., 959 F.2d 883, 890 (10th Cir. 1992)).

But we require more than a state official's mere failure to exercise professional judgment. Gutteridge v. Oklahoma, 878 F.3d 1233, 1239 (10th Cir. 2018). The abdication of her professional duty must be sufficient to shock the conscience. Id. We have defined "conduct that shocks the judicial conscience" as "deliberate government action that is 'arbitrary' and 'unrestrained by the established principles of private right and distributive justice.'" Seegmiller v. LaVerkin City, 528 F.3d 762, 767 (10th Cir. 2008) (quoting Cty. of Sacramento v. Lewis, 523 U.S. 833, 845 (1998)). Plaintiffs must show Defendants "arbitrarily abused [their] authority or 'employ[ed] it as an instrument of oppression.'" Hernandez v. Ridley, 734 F.3d 1254, 1261 (10th Cir. 2013) (quoting Williams v. Berney, 519 F.3d 1216, 1220 (10th Cir. 2008)). Indeed, Defendants' behavior must be "egregious and outrageous." Id. We consider Defendants' "conduct as a whole"—"both action and inaction"—in assessing whether that behavior is conscience shocking. Estate of B.I.C. v. Gillen, 710 F.3d 1168, 1174 (10th Cir. 2013). In evaluating substantive due process claims

12

in this context, we consider: "(1) the general need for restraint; (2) the concern that § 1983 not replace state tort law; and (3) the need for deference to local policy decisions impacting public safety." Currier, 242 F.3d at 920.

Rather than precisely define the boundaries of conscience-shocking behavior, we have left them to "evolve over time." Armijo ex rel. Chavez v. Wagon Mound Pub. Sch., 159 F.3d 1253, 1262 (10th Cir. 1998). We have established, however, that conscience shocking behavior "requires a high level of outrageousness, because the Supreme Court has specifically admonished that a substantive due process violation requires more than an ordinary tort." Id. Thus, "liability for negligently inflicted harm is categorically beneath the threshold of constitutional due process." Lewis, 523 U.S. at 849. Indeed, even "knowingly permitting unreasonable risks to continue does not necessarily rise to the level of conscious shocking." DeAnzona v. City & Cty. of Denver, 222 F.3d 1229, 1235 (10th Cir. 2000). With these principles in mind, we address each Defendant's conduct in turn.

1.

Plaintiffs argue that Defendant Anderson abdicated her professional responsibility in recommending Angel's removal from Blackwell's home into the Bond/White household. Plaintiffs point out that, in Blackwell's home, Angel recovered from two months of toxic upbringing and was thriving. Even so, Anderson recommended that Angel move to a home with a twenty-year-old mother and a twenty-one-year-old father who already had two young children. Plaintiffs state that Anderson knew White had untreated mental health problems, a history of being

13

abused, a history of physically abusing her mother, and a history of having a temper and being unforgiving. Plaintiffs also point out that Bond worked all day, leaving White socially isolated. Plaintiffs assert that Anderson simply deferred to kinship placement rather than exercise professional judgment to assess Angel's best interest. Plaintiffs say this decision showed an improper bias for a kinship placement and a deference to her supervisor's wishes without regard to Angel's best interest.

Defendant Anderson did not fail to exercise her professional judgment. She conducted a home study that required her to investigate Bond and White's backgrounds. During that process, Anderson assembled and reviewed documents and conducted interviews and home visits. Rather than abdicate her professional judgment, Anderson discovered and considered the "red flags" that Plaintiffs contend should have caused her to reject Bond and White as foster parents. See Johnson ex rel. Estate of Cano v. Holmes, 455 F.3d 1133, 1144 (10th Cir. 2006) (stating that when a social worker, along with others at a department, decides "to go ahead and place" a child in the face of "mild doubts does not constitute a failure to exercise professional judgment."). She did not hide those red flags from the state court. But along with the red flags, Anderson found that White appeared to care for her own children well and that White and Bond were financially stable and owned their own home. In retrospect, Anderson made the wrong decision in removing Angel from Blackwell's home, but the evidence is clear and undisputed that Anderson thoroughly investigated White and Bond, considered the evidence before her, made a judgment that placement with White and Bond would be in Angel's best interest, and

14

recommended a kinship placement.  See id. ("That two professionals both conducted an investigation and simply disagreed about a diagnosis is not proof, in and of itself, that either professional has abandoned her professional judgment.").

And even if we assumed that Anderson abdicated her professional duties by placing Angel in the White/Bond household, under these circumstances, Anderson's conduct does not shock the conscience.  See Schwartz, 702 F.3d at 583 ("[A] social worker who simply makes a mistake of judgment under what are admittedly complex and difficult conditions will not find herself liable in damages under § 1983.").  Anderson did not arbitrarily abuse her authority or employ it as an instrument of oppression.  Anderson did not fail to investigate the Bond/White household or fail to discover their weaknesses.  Rather, the record reveals that she made a decision after weighing the facts.  Considering the positive factors outlined in the home study, although a reasonable jury could conclude that Anderson's recommendation was negligent, no reasonable jury could conclude that Anderson failed to exercise professional judgment.  Although Anderson may have reached an incorrect decision, we further conclude that no reasonable jury could conclude her actions in making that decision shock the conscience.

2.

Plaintiffs posit that Defendant Bedell is liable on the same basis as Defendant Anderson—recommending placement in the Bond/White household.  Plaintiffs argue that Bedell had the authority and a duty to overrule Anderson's decision, but abdicated her professional responsibility in choosing not to do so.

15

For the reasons stated above as to Defendant Anderson, we believe that Defendant Bedell did not fail to exercise her professional judgment and that Bedell's conduct does not shock the conscience. As Anderson's supervisor, Bedell had the same information before her in recommending placement with the Bond/White household. Bedell sent Anderson a message stating: "We give preference to family unless there is extenuating circumstances that it would be detrimental to the child (i.e. breaking the attachment during critical developmental stages.)." Plaintiffs contend that this email encouraged Anderson to favor White and Bond regardless of Angel's best interest. Bedell's actions in signing off on Anderson's recommendation and sending the email about kinship placement did not demonstrate a failure of exercising professional judgment. Nor do these actions shock our conscience. As with Defendant Anderson, although Defendant Bedell may have come to the wrong conclusion in hindsight, the department thoroughly investigated White and Bond and discovered their weaknesses. Even if Bedell attempted to sway Anderson, Bedell considered this information and still reached a decision to sign off on Anderson's recommendation. Bedell did not threaten Anderson with loss of job or any similar adverse action if she failed to favor Bond and White nor could a reasonable jury construe her email in such manner. Under these circumstances, Bedell's conduct does not shock the conscience—and no reasonable jury could conclude otherwise.

3.

Like with Defendants Anderson and Bedell, Plaintiffs fault Defendant Stewart for recommending placement in the Bond/White household. For the reasons stated

16

above as to Defendants Anderson and Bedell, we believe that Defendant Stewart did not fail to exercise her professional judgment in recommending placement in the Bond/White household and that her conduct in this regard does not shock the conscience.

Plaintiffs also assert that Defendant Stewart failed to exercise her professional judgment when she "misled" the state court judge by stating that MCDHS had approved White for foster care without revealing the waiver had not yet been approved.   If a foster parent is under age twenty-one, MCDHS requires a waiver. MCDHS admits that a clerical error caused the waiver paperwork not to be signed until July 2014—after the hearing.  But the record establishes that the only item missing at the time of the hearing was a signature.  Plaintiffs do not provide evidence that Stewart knew that the waiver lacked a signature.  Plaintiffs also state Stewart failed to call attention to information counselling against the kinship placement— specifically, not volunteering the red flags in the report to the state court judge.  We note, however, that Stewart was a witness at the trial and testified truthfully under oath.  And the state court judge had a copy of the home study report, which contained the "red flags" Plaintiffs raise on appeal.

Plaintiffs compare Stewart's testimony to that of the defendant in T.D., 868 F.3d at 1209.  In T.D., a case worker intentionally deleted and omitted concerns about placement to a judge because she feared being fired from her job.  Id.  That is not the case here.  Stewart deleted nothing from the judge's copy of the home study

17

report.  She testified truthfully.  Her testimony at the hearing did not prove that she failed to exercise her professional judgment and it does not shock the conscience.

Next, Plaintiffs point to Stewart's failure to heed warning signs once MCDHS completed the transition.  Plaintiffs say that when Blackwell raised concerns, Stewart disregarded them because she saw Blackwell as seeking to sabotage the placement. We conclude that Stewart did not fail to exercise her professional judgment during the transition period.  The record reflects that although MCDHS did not believe Blackwell's allegations of abuse and neglect at the Bond/White household, MCDHS and law enforcement did not ignore the allegations.  Rather, both investigated the allegations during the transition period and believed them to be unfounded.  The record shows that MCDHS inspected Angel following each visit and did not observe that she was unusually dirty or otherwise out of the ordinary.  Stewart investigated the allegation that White and Bond ignored Angel's ear medication.  She concluded that White had also noticed the infection and took Angel to their family physician. The physician prescribed a cream that White applied.  As to the serious allegation that Angel returned from a visit to the Bond/White household with a bruise under her eye, MCDHS and law enforcement immediately investigated.  Both Stewart and Blackwell's case manager obtained and reviewed photographs of the alleged bruise and agreed no bruise was present.  Instead, they concluded that the mark or redness was the type that a baby's fingernails might make.  These incidents would not put a reasonable social worker on notice of abuse or the need to withdraw Angel from this placement.  Compare Taylor ex. rel Walker v. Ledbetter, 818 F.2d 791, 797 (11th

18

Cir. 1987) (holding that every child in foster care may not prevail in a § 1983 action against state officials based on "incidental injuries or infrequent acts of abuse"), with T.D., 868 F.3d at 1230 (concluding awareness of and failure to investigate evidence of multiple instances of abuse rose to a degree of outrageousness and a magnitude of potential or actual harm that was conscience shocking).  Stewart's behavior during the transition period did not represent a failure to exercise her professional judgment and her actions do not shock the conscience.

Plaintiffs also believe Stewart's failure to take prompt, significant action after the August 20 meeting—in which White expressed her exasperation with the foster arrangement—not only was an abdication of her professional judgment, but also was conscience shocking.  Plaintiffs believe that Stewart disregarded Angel's inability to adjust to the other children in the household and that the August 20 meeting should have triggered Stewart to remove Angel or obtain immediate help for White.  Plaintiffs argue that we cannot view the August 20 meeting in a vacuum.  Plaintiffs assert that Stewart knew that White had untreated anxiety and depression and that she had expressed a need for counseling.  Stewart knew White had been the victim of abuse and that she sometimes reacted violently towards adult family.  Plaintiffs also point out White's documented temper and that she was "already burdened" with two small children.

We are not presented with the scenario of an absent social worker.  Here, Stewart and another social worker, as well as a licensed counselor visited the Bond/White household after the July 11 placement.  Stewart met with and observed

19

the family in their home on July 24 and August 1. On August 7, the counselor met with and observed the family at the MCDHS office. On August 20, Stewart and another social worker met with and observed the family in their home. On August 30, the other social worker met with and observed the family when she ran into them at a Wal-Mart. Stewart and the other social worker did not believe Angel was in danger. They personally observed White and Angel and spoke with the counselor. They believed that White's stress was natural with a new child. Stewart offered to place White in a kinship support group and set up an assessment to determine whether Angel had any developmental or other disabilities. Bond knew that White suffered stress daily but believed she could handle it. White's mother also believed none of the children were in danger. Although hindsight reveals that MCDHS should have removed Angel from the Bond/White household following the August 20 meeting, Stewart did not fail to exercise her professional judgment. She met with and observed the family and consulted with other professionals in exercising her judgment. Thus, Stewart's conduct in this regard does not shock the conscience.

Finally, Plaintiffs contend that Stewart did nothing when Angel reportedly ran into a kitchen island playing tag even though Angel could not yet crawl. Following this incident, Stewart met with and observed the family in their home three more times before Angel's death. The counselor and another social worker also met with and observed Angel with White and Bond. True, Stewart did not investigate the allegation that Angel hurt herself playing tag. But even assuming this failure to investigate amounted to an abdication of Stewart's official duties, it does not shock

20

the conscience. Gutteridge, 878 F.3d at 1242 (concluding that failing to investigate an allegation that a child fell backward in a tub and hit her head did not shock the judicial conscience where an agency investigated both a shoulder fracture and facial bruising).

B.

The state created danger exception applies when "a state actor affirmatively acts to create, or increase[] a plaintiff's vulnerability to, danger from private violence." T.D., 868 F.3d at 1221 (10th Cir. 2017) (quoting Currier, 242 F.3d at 923). To invoke this exception, a plaintiff must minimally make "a showing of affirmative conduct and private violence." Estate of B.I.C., 710 F.3d at 1173. The plaintiff then establishes her claim by showing:

> (1) [T]he charged state entity and the charged individual actors created the danger or increased plaintiff's vulnerability to the danger in some way;
> (2) plaintiff was a member of a limited and specifically definable group;
> (3) defendants' conduct put plaintiff at substantial risk of serious, immediate, and proximate harm; (4) the risk was obvious or known;
> (5) defendants acted recklessly in conscious disregard of that risk; and
> (6) such conduct, when viewed in total, is conscious shocking.

Currier, 242 F.3d at 918.

1.

Plaintiffs argue Defendant Anderson engaged in an affirmative act that increased Angel's vulnerability to danger when she affirmatively recommended the state move Angel from Blackwell's home to the White/Bond household. And further that this action put Angel at risk of violence from White.

21

To be sure, Anderson knew that White had suffered past physical and emotional abuse and that she had depression and anxiety. Plaintiffs also point to White's temper and past physical abuse towards her mother as well as the fact that White and Bond admittedly fought almost daily. Not to mention the fact that White was twenty years old and already had two small children. But Plaintiffs fail to focus on White's traits that weighed in the other direction. The record reflects that White had never been abusive towards her own children. Indeed, evidence shows that individuals close to White considered her a good and fit parent. White and Bond had expressed an interest in fostering Angel for quite some time and attended court hearings.

Given the information before Anderson, Plaintiffs cannot prevail on their state created danger claim because Anderson was, at most, negligent. And "mere negligence does not shock the conscience." DeAnzona, 222 F.3d at 1236. Some risk will always exist whenever an agency removes a child from a foster home where she is thriving to place that child with family. But our job is not to evaluate the wisdom of state policies that favor kinship placement. White had no record of abusing children. Although some factors weighed against placing Angel in the White/Bond household and a reasonable jury could conclude that Anderson's recommendation would lead to a substantial risk of serious, immediate, and proximate harm to Angel, Anderson's at most negligent decision does not shock the conscience.

2.

Plaintiffs contend that a jury could find Defendant Bedell liable on the same basis as Defendant Anderson. Not only did she sign off on Defendant Anderson's recommendation, but she also concurred in it. Plaintiffs again assert that Bedell's email to Anderson stating that the agency gives kinship preference "unless there is extenuating circumstances that it would be detrimental to the child" ignores the best interest of the child standard and encouraged Anderson to favor White and Bond.

For the same reasons Plaintiffs cannot prevail against Defendant Anderson, they likewise cannot prevail against Defendant Bedell. And although a reasonable jury could conclude that Bedell's email applied pressure on Anderson to recommend the Bond/White household, we do not believe that a reasonable jury could conclude that Defendant Bedell's actions shock the conscience.

3.

For the same reasons Plaintiffs cannot prevail against Defendants Anderson and Bedell, they cannot prevail against Defendant Stewart as to Stewart's placement recommendation. Plaintiffs fault Defendant Stewart for having read the attachment assessment, which said Angel was becoming attached to Blackwell. But the attachment assessment also cleared the placement with White and Bond if it occurred immediately. Although we believe that a reasonable jury could conclude that recommending to place Angel with White and Bond despite the attachment assessment led to a substantial risk of serious, immediate, and proximate harm to Angel, no reasonable jury could find that shocks the conscience.

23

Besides recommending the state transfer Angel from Blackwell to Bond and White, Plaintiffs assert Defendant Stewart engaged in the affirmative conduct of developing the "inadequate, expedited transition plan," failing to mention to the state court judge that a waiver had not been signed, and failing to investigate Blackwell's concerns during the transition.  Failing to mention that the waiver was not signed did not lead to a substantial risk of serious, immediate, and proximate harm to Angel.  As discussed in the previous section, the agency cleared White for being under twenty-one years old, but the agency lacked only a signature.  And even if a reasonable jury could conclude that Stewart failed to properly investigate Blackwell's concerns during the transition, evidence in the record shows that Stewart and law enforcement did investigate Blackwell's allegations about White and Bond's mistreatment of Angel during the transition to some degree.  We conclude no reasonable jury could conclude that this shocks the conscience.

Finally, Plaintiffs say nothing of the transition plan other than it "contributed to Angel's deterioration, which put additional stress on the already fragile White." This bare-bones argument fails to demonstrate how the transition plan contributed to Angel's deterioration.  See Christian Heritage Acad. v. Okla. Secondary Sch. Activities Ass'n, 483 F.3d 1025, 1031 (10th Cir. 2007) (observing that when a party on appeal "does not support [an] issue with argument, the issue is waived").  And "[c]ourts do not usually raise" and decide arguments "on their own."  Henderson ex rel. Henderson v. Shinseki, 562 U.S. 428, 434 (2011).  Thus, we do not consider Plaintiff's argument on this point.

\* \* \*

In sum, Defendants investigated Bond and White before placing Angel in their home. Defendants also investigated Blackwell's claims that Bond and White abused Angel during the transition. Defendants compiled the relevant information— including the "red flags"—and decided to place Angel in the Bond/White household. In hindsight, the decision not to remove Angel from the Bond/White household following the August 20 meeting cost Angel her life—and we conclude that a jury could find their actions negligent. But nothing in the record supports Plaintiffs' position that Defendants' actions shock the conscience.

AFFIRMED.

Entered for the Court


Joel M. Carson III
Circuit Judge